

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-20-00068-CV

HHH FARMS, L.L.C., HARTWELL FARMS, LLC,
AND WAYMON SCOTT HARTWELL, Appellants

V.

FANNIN BANK, Appellee

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. CV-15-42242

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Burgess

# OPINION

The disputes in this case involve four agriculture-related loans to Hartwell Farms, LLC (H. Farms), which were guaranteed by Waymon Scott Hartwell (Hartwell) (collectively the Hartwell Parties).[1] Two of the loans were made by Fannin Bank (Fannin), and two were made by American Bank (American). The Hartwell Parties defaulted on Fannin's loans but paid off the American loans with proceeds from the sale of their wheat crop.

Fannin sued the Hartwell Parties to recover on its loans to them, and the Hartwell Parties asserted several counterclaims against Fannin. Fannin also sued American to recover the sale proceeds that it argued were covered by a perfected first lien security interest in H. Farms's crops. The trial court granted Fannin's motion for summary judgment on its claims against the Hartwell Parties and on the Hartwell Parties' claims against Fannin. The trial court also granted American's motion for summary judgment against Fannin relating to ownership of the crop proceeds.

The Hartwell Parties appeal the summary judgment in favor of Fannin, and Fannin appeals the summary judgment in favor of American. In Part I of this opinion, we reverse in part and affirm in part Fannin's summary judgment against the Hartwell Parties on Fannin's claims for relief. In Part II of this opinion, we affirm Fannin's summary judgment on the Hartwell Parties' counterclaims against Fannin. Finally, in Part III of this opinion, we reverse American's summary judgment against Fannin.

---

[1]The Hartwell Parties designation also includes another Hartwell entity, HHH Farms, LLC, which is discussed later in this opinion.

## I.     Factual and Procedural Background

### A.     The Fannin Bank Loans

Two of Fannin's loans to H. Farms are the subject of this appeal.  The first loan was evidenced by a promissory note and security agreement executed by H. Farms on March 28, 2014, in the original principal amount of $750,000.00, payable to Fannin (Note One).  Note One matured on February 15, 2015.  To secure the payment and performance of the debt, H. Farms granted Fannin a security interest in all of the property described in Note One's security agreement, including all proceeds and products from the property.[2]  Note One was a revolving draw loan that was partially guaranteed by the U.S. Farm Service Agency (FSA).[3]  According to Fannin, as of December 6, 2019, the total outstanding principal on Note One was $617,096.80.

The second loan was evidenced by a promissory note and security agreement executed by H. Farms on August 19, 2014, in the original principal amount of $129,445.73, payable to Fannin (Note Two).  Note Two matured on January 31, 2015.[4]  To secure the payment and performance of the debt, H. Farms granted Fannin a security interest in all of the property described in the security agreement, including all proceeds and products from the property.[5]

---

[2]Property subject to the security agreement included inventory; equipment; farm products; government payments and programs; all machinery, equipment, and livestock listed in the U.S. Farm Service Agency Application for Guarantee dated March 26, 2014; and all proceeds from crop insurance payments.

[3]This loan partially refinanced a pre-existing line of credit, and $557,000.00 of the loan amount was used to pay off the pre-existing line of credit.

[4]This was an equipment loan and was a renewal of a previous loan in the amount of $149,245.74.

[5]Property subject to the security agreement included equipment, farm products, government payments and programs, and all crop insurance proceeds.

3

According to Fannin, H. Farms made no payments on Note Two and failed to pay it when it matured.

Hartwell signed both notes in his capacity as president of H. Farms. Hartwell also signed guaranty agreements guaranteeing payment and performance of Notes One and Two. Both notes included language that prohibited H. Farms and Hartwell from granting a security interest in the collateral subject to those notes without Fannin's consent, transferring collateral without Fannin's consent, or creating a new entity without Fannin's consent.[6]

B.     The American Bank Loans

During the same period of time, Hartwell was seeking financing through Fannin, he also had a lending relationship with American. The summary judgment evidence showed that as early as May 2010, both Fannin and American were providing financing to H. Farms and Hartwell. Accordingly, the Fannin and American Loans somewhat overlapped each other. Garrett Adams, American's branch manager, explained the history behind the American loans.

On July 24, 2013—which was before Hartwell had obtained the first Fannin loan— American loaned H. Farms $136,000.00 for seed and fertilizer. The promissory note for this loan was signed by Hartwell on behalf of H. Farms. Hartwell then applied for the first Fannin loan, but because it can take several months to complete and fund an FSA guaranteed loan,

---

[6]In connection with Note One, Hartwell executed a commercial loan agreement, which specifically stated,
> I will obtain your written consent before organizing, merging into, or consolidating with an entity; acquiring all or substantially all the assets of another; material changing the legal structure, management, ownership, or financial condition; or effecting or entering into a domestication, conversion or interest exchange.

In defining events of default, which would trigger demand for payment, Note Two stated,
> [Y]ou may demand payment in full if . . . [w]ithout your written consent, I organize, merge into, or consolidate with an entity; acquire all or substantially all of the assets of another; materially change the legal structure, management, ownership or financial condition; or effect or enter into a domestication, conversion or interest exchange.

4

Hartwell approached American for a second seed and fertilizer loan. Amlin became aware that H. Farms was in the process of obtaining an FSA guaranteed loan through Fannin, so he emailed Allen Sanderson, Fannin's president, on February 18, 2014, inquiring as to the status of the first FSA guaranteed loan at Fannin and asking if Fannin would pay off the seed and fertilizer loans if American advanced the funds. Based on Sanderson's response to Amlin's email, and based on the parties' prior course of dealing, Amlin understood that American's seed and fertilizer loans could be paid off from the Fannin funds once the FSA guaranteed loan was funded. American then loaned H. Farms $100,000.00 on February 21, 2014. That note was likewise signed by Hartwell on behalf of H. Farms.[7]

### C. Sale of the Wheat Crop

On August 18, 2014, Hartwell took his wheat crop to Wolfe City to sell. In return, Wolfe City issued a check to Hartwell in the amount of $272,855.57. On the same day, Hartwell deposited the check issued by Wolfe City into the H. Farms checking account at American and issued a check to American from the H. Farms checking account in the amount of $237,395.95 to pay off the two seed and fertilizer loans.[8] American accepted the funds and applied them to the two H. Farms seed and fertilizer loans: (1) the July 24, 2013, $136,000.00 loan and (2) the February 21, 2014, $100,000.00 loan. Hartwell testified that he was not aware that Fannin expected him to pay down his line of credit at Fannin with the proceeds from his crop sales.

---

[7]Although each of those notes was secured by certain equipment described in exhibits attached to the notes, the right to that collateral is not at issue.

[8]It appears that the $100,000.00 promissory note executed by H. Farms in favor of American was a renewal of an earlier promissory note—although it is not clear which note it renewed.

Cheryl Darwin, a mortgage loan officer for Fannin, testified that she sent notices of Fannin's security interest to Wolfe City in September 2014, but later learned that the money for the H. Farms crops had already been disbursed.

### D. The Formation of HHH Farms, LLC

After Notes One and Two were executed, Hartwell formed a new entity called HHH Farms, LLC (HHH), on September 8, 2014. Hartwell testified that he established HHH for the purpose of buying and selling farm equipment financed through American. Hartwell further testified that, at the time, he was farming only under HHH and that H. Farms did not do any farming. Hartwell testified that he started farming through HHH because that was the only way he could get crops in the ground. Hartwell borrowed money from American for his farming operations through HHH, which did business solely with American. Hartwell, who was the sole member of HHH and H. Farms, did not inform Fannin that he was going to continue his farming only under HHH.

### E. Fannin's Initial Lawsuit

Fannin initially sued Hartwell and H. Farms on May 1, 2015, alleging that H. Farms defaulted on Notes One and Two and that Hartwell defaulted on his guaranties of those notes. Fannin sought a temporary restraining order enjoining H. Farms and Hartwell from alienating Fannin's collateral. In an affidavit attached to the petition, Fannin alleged that Hartwell and H. Farms sold crops in which Fannin held a security interest and failed to use the proceeds to pay down the debt to Fannin. The trial court granted Fannin's application for a temporary restraining

6

order, concluding that Hartwell and H. Farms did not have sufficient assets to repay the debt to Fannin without foreclosure on the collateral. The trial court set a hearing date of May 7, 2015.

### F. The H. Farms Bankruptcy

On May 7, 2015, Hartwell, on behalf of H. Farms, filed a certificate of resolution indicating that the members of H. Farms resolved to file Chapter 11 bankruptcy. The bankruptcy filing's list of equity shareholders in H. Farms lists Hartwell as the sole member. In response to Fannin's motion for relief from the automatic stay, H. Farms stated that it had no ownership interest in any crops described as collateral in Notes One and Two. Instead, it claimed that HHH was the owner of any and all crops on all agricultural leases. Fannin and H. Farms ultimately entered into an agreed order granting Fannin's motion for relief from the automatic stay. Among other things, the agreed order specifically stated that all proceeds from wheat sales had to be deposited in H. Farms's bank pending further determination of the parties' respective rights and obligations with regards to such proceeds. Fannin thereafter filed a motion for entry of an order to show cause why sanctions should not be imposed against H. Farms, alleging that Hartwell spent proceeds from wheat sales in violation of the agreed order. The parties entered into an agreed order granting Fannin's motion that required Hartwell and H. Farms to deposit $97,760.01 into the Interest on Lawyers' Trust Account (IOLTA) of Fannin's attorneys. The agreed order dismissing the case stated that the funds in the IOLTA must remain there pending adjudication of Fannin's and HHH's rights to the proceeds by a court of competent jurisdiction or written agreement of the parties.

7

## G.    Fannin's Second Lawsuit

While H. Farms was in bankruptcy, Fannin brought a new lawsuit against HHH, Wolfe City, and American on June 29, 2015, alleging claims of conversion of its collateral against all defendants and tortious interference with contract based on Wolfe City's and American's alleged interference with Notes One and Two. Fannin sought a declaration that its security interests in the collateral securing Notes One and Two attached, were perfected, and had priority over any claims of HHH, American, and Wolfe City.

### 1.    Fannin's Claims Against the Hartwell Parties and American

On November 18, 2016—after H. Farms emerged from bankruptcy—Fannin filed its first amended petition adding H. Farms and Hartwell as defendants. That is the pleading on which Fannin based its motions for summary judgment against H. Farms, HHH, Hartwell, and, separately, American.[9] Fannin alleged that the indebtedness of H. Farms was evidenced by Notes One and Two, that both notes were in default, and that the guaranties of the notes, executed by Hartwell and secured by property held in his name, were likewise in default. Fannin further alleged that Hartwell was the principal of H. Farms and HHH and that both notes prohibited H. Farms and Hartwell from granting a security interest in the collateral or in creating a new entity without Fannin's consent.

Fannin claimed that, despite that agreement, Hartwell created HHH on September 8, 2014, transferred collateral from H. Farms to HHH, and then pledged that collateral to American in consideration of loans American made to HHH. In addition, HHH and/or Hartwell sold wheat

---

[9]On March 7, 2017, Fannin and Wolfe City filed a joint notice of nonsuit with prejudice relating only to (1) claims asserted by Fannin against Wolfe City and (2) counterclaims asserted by Wolfe City against Fannin.

to Wolfe City, and Wolfe City paid the proceeds of those sales to HHH and/or Hartwell. Then, HHH and/or Hartwell paid a portion of those proceeds to American—even though Fannin's security interest was perfected before any interest of American, HHH, or Wolfe City attached. Fannin further contended that American had constructive notice of Fannin's interest in the collateral and proceeds therefrom. Based on those allegations, Fannin claimed that Hartwell created HHH with the intent of defrauding Fannin and with the intent of avoiding H. Farms's and Hartwell's own agreements on the notes and guaranties.

Fannin also alleged claims of conversion of its collateral in which it had a prior, perfected security interest, tortious interference with contract, and breach of contract. It sought judicial foreclosure on all property subject to its liens against all defendants. Fannin also claimed that HHH, H. Farms, and Hartwell were jointly and severally liable for its damages based on theories of alter ego and sham because Hartwell used HHH and H. Farms to perpetrate a fraud on Fannin. Fannin asked the court to declare that its security interests in the collateral had priority over the claims of HHH, American, and Wolfe City and sought damages for the indebtedness on the notes and guaranties and attorney fees in accordance with those documents.

### 2. American's Affirmative Defenses and Counterclaim

American's answer asserted the affirmative defenses—as relevant here—of estoppel, laches, and waiver. American also counterclaimed for declaratory judgment, seeking a declaration that it was entitled to the funds H. Farms paid to it in the amount of $237,395.95, free

9

and clear of Fannin's alleged security interest in those proceeds, pursuant to Section 9.332 of the Texas Business and Commerce Code. *See* TEX. BUS. & COM. CODE ANN. § 9.332.[10]

### 3. The Hartwell Parties' Counterclaims

HHH,[11] Hartwell, and H. Farms filed a counterclaim against Fannin, alleging breach of contract and wrongful acceleration of Notes One and Two, wrongful garnishment, violations of the Texas Deceptive Trade Practices Act (DTPA), conversion, tortious interference, and usury.

### H. American's Motion for Summary Judgment Against Fannin

On December 31, 2018, American filed a traditional motion for summary judgment against Fannin in which it sought judgment on Fannin's claim of conversion of crop proceeds.[12] American claimed that Fannin's conversion claim failed because American had the lawful right to exercise control over the proceeds because (1) American was required to follow the directions of its depositor (Hartwell) regarding knowledge of a security interest and (2) American had Fannin's consent to possess the proceeds because it did not receive a revocation of consent from Fannin. American further claimed that Fannin was estopped to claim the proceeds because

_____

[10]Section 9.332 of the Texas Business and Commerce Code provides:
> (a)     A transferee of money takes the money free of a security interest unless the transferee acts in collusion with the debtor in violating the rights of the secured party.
> (b)     A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party.

*See* TEX. BUS. & COM. CODE ANN. § 9.332

[11]On September 13, 2017, HHH filed a Chapter 11 Bankruptcy petition. The petition listed the amount of Fannin's claim as "unknown" and listed the value of the collateral that supported that claim as $450,000.00. Lone Star, Fannin, and HHH entered into an agreed order granting a joint motion for approval of compromise and settlement. The agreement was confidential. The bankruptcy case was dismissed on May 24, 2018. HHH failed to confirm a plan.

[12]The trial court had previously granted American's motion for summary judgment on Fannin's claim for tortious interference with contract, finding that American was entitled to summary judgment since it had disproven at least one element of that cause of action.

(1) Fannin agreed to pay off the 2014 seed and fertilizer loan and American detrimentally relied on that representation in making the $100,000.00 loan to H. Farms and (2) Fannin was negligent in failing to notify American of its claim to the proceeds and American had no knowledge of H. Farms's default on its debt to Fannin. Finally, American claimed—in reliance on Section 9.332 of the Business and Commerce Code—that, as transferee of money and funds, it took the money free of Fannin's security interest.

## I.      Fannin's Motion for Summary Judgment Against American

On April 17, 2019, Fannin filed a traditional motion for summary judgment against American on Fannin's conversion and declaratory judgment claims and on American's counterclaim for declaratory judgment. Fannin claimed that, pursuant to Section 9.315(a), subsections (1) and (2), of the Texas Business and Commerce Code, its security interest in the collateral continued, notwithstanding its sale or lease and that its security interest attached to any identifiable proceeds from the collateral. *See* TEX. BUS. & COM. CODE ANN. § 9.315(a)(1), (2). Fannin further claimed that American had actual and constructive knowledge that Fannin had a lien on H. Farms's crops, that Fannin had not released that lien, and that American accepted funds from Hartwell that it knew came from crop sales.

After considering Fannin's and American's competing motions, the trial court granted American's motion for summary judgment, ruling that Fannin take nothing on its claim of conversion of its collateral proceeds in the amount of $237,395.95 and that American maintain possession and use of said proceeds.

11

**J.     Fannin's Motion for Summary Judgment Against H. Farms, Hartwell, and HHH**

Fannin filed a traditional motion for summary judgment on its claims for breach of contract against H. Farms and Hartwell, as well as its alter ego claims and request for judicial foreclosure. Its traditional motion also sought summary judgment on all of the counterclaims of HHH, H. Farms, and Hartwell because one or more elements were conclusively negated. Fannin's no-evidence motion was directed solely to the counterclaims.[13]

The trial court granted summary judgment in favor of Fannin. It ordered that Fannin recover the following amounts from Hartwell, H. Farms, and HHH, jointly and severally: (1) actual damages in the amount of $746,542.53, (2) pre-judgment interest on Note One in the amount of $696,478.23, (3) pre-judgment interest on Note Two in the amount of $58,325.72, and (4) attorney fees in the amount of $283,631.00. In addition, the trial court granted a judgment of foreclosure of Fannin's liens against H. Farms and Hartwell and ordered that Hartwell, H. Farms, and HHH take nothing from Fannin on its counterclaims.

**K.     This Appeal and Cross-Appeal**

On appeal, the Hartwell Parties contend that the trial court erred in granting Fannin's motion for summary judgment because there existed multiple issues of material fact that were not conclusively established by the summary judgment evidence and the summary judgment order was otherwise defective in multiple ways. More specifically, they claim that (1) Fannin's evidence does not conclusively establish that the Hartwell Parties' alleged debts were calculated

---

[13]After the trial court informed the parties that it intended to grant Fannin's motion for summary judgment on its breach of contract and alter ego claims, Fannin filed a notice of abandonment of its claims against HHH, H. Farms, and Hartwell for conversion, tortious interference with contract, and fraudulent transfer.

correctly; (2) Hartwell's second guaranty limits his total liability to the amount set forth in that guaranty, (3) the trial court improperly awarded attorney fees because fees were not requested or segregated and were contested, (4) the trial court improperly granted summary judgment on Fannin's alter ego claims because Fannin did not meet its burden of proving alter ego and did not expressly plead actual fraud or address actual fraud in its motion for summary judgment, (5) the trial court erred by granting summary judgment on the Hartwell Parties' usury counterclaim, which was not addressed in the motion for summary judgment, and (6) the trial court erred in granting Fannin's no-evidence motion for summary judgment on the Hartwell Parties' counterclaims because more than a scintilla of evidence exists to support the elements of the counterclaims.

In its cross-appeal against American, Fannin claims that American was not entitled to summary judgment because (1) Fannin had a perfected security interest in H. Farms's crops that continued in the proceeds from the sale of those crops and (2) American failed to conclusively establish its superior right to the possession of proceeds from the sale of Fannin's collateral because (a) the fact that Wolfe City paid Hartwell individually for the crop sale, rather than H. Farms, does not defeat Fannin's security interest in the proceeds from the sale; (b) Section 9.332 of the Texas Business and Commerce Code does not permit American to take the proceeds free and clear of Fannin's liens; and (c) American converted the proceeds from the sale of Fannin's collateral, and Section 9.341 of the Texas Business and Commerce Code[14] does not insulate

---

[14]Section 9.341 of the Texas and Business Commerce Code provides:

> Except as otherwise provided in Section 9.340(c), and unless the bank otherwise agrees in an authenticated record, a bank's rights and duties with respect to a deposit account maintained with the bank are not terminated, suspended, or modified by:

American from liability. Fannin further claims that this Court should render judgment for Fannin on its declaratory judgment action and remand the remainder of Fannin's claims against American to the trial court.

## II. Standard of Review

"The grant of a trial court's summary judgment is subject to de novo review by appellate courts." *Brown v. CitiMortgage, Inc.*, No. 06-14-00105-CV, 2015 WL 2437519, at *2 (Tex. App.—Texarkana May 22, 2015, no pet.) (mem. op.) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). "In making the required review, we deem as true all evidence which is favorable to the nonmovant, we indulge every reasonable inference to be drawn from the evidence, and we resolve any doubts in the nonmovant's favor." *Id.* (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)). "When the trial court does not specify the basis for its ruling, we must affirm a summary judgment if any of the grounds on which judgment is sought are meritorious." *Id.* (citing *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013)).

"To be entitled to traditional summary judgment, a movant must establish that there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law." *Id.* (citing TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009)). "Once the movant produces evidence entitling it to summary judgment, the burden shifts to the nonmovant to present evidence raising a genuine issue of

---

    (1)    the creation, attachment, or perfection of a security interest in the deposit account;
    (2)    the bank's knowledge of the security interest; or
    (3)    the bank's receipt of instructions from the secured party.
*See* TEX. BUS. & COM. CODE ANN. § 9.341.

14

material fact." *Id.* (citing *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996)). "A defendant who conclusively negates a single essential element of a cause of action or conclusively establishes an affirmative defense is entitled to summary judgment on that claim." *Id.* (citing *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010)). "When both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides and determine all questions presented." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009) (citing *Comm'rs Court of Titus Cty. v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997)).

"A no-evidence summary judgment is essentially a pretrial directed verdict. Therefore, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict." *Seidler v. Morgan*, 277 S.W.3d 549, 552 (Tex. App.—Texarkana 2009, pet. denied) (citing *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002)). "We must determine whether the plaintiff produced any evidence of probative force to raise a fact issue on the material questions presented." *Id.* at 552–53 (citing *Seidler*, 277 S.W.3d at 552; *Woodruff v. Wright*, 51 S.W.3d 727, 734 (Tex. App.—Texarkana 2001, pet. denied)). "A nonmovant will defeat a no-evidence summary judgment motion if the nonmovant presents more than a scintilla of probative evidence on each element of his or her claim." *Id.* at 553 (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)); *see Rhine v. Priority One Ins. Co.*, 411 S.W.3d 651, 657 (Tex. App.—Texarkana 2013, no pet.).

15

**Part I—Fannin's Claims Against HHH, H. Farms, and Hartwell**

**III.  Summary Judgment Was Proper Regarding Fannin's Breach of Contract Claims, but Fact Issues Exist Regarding Fannin's Alter Ego and Attorney Fees Claims**

**A.  Introduction**

The Hartwell Parties' appeal of the trial court's order granting Fannin's motion for summary judgment against them raises three separate questions.  The first question is whether Fannin was entitled to summary judgment on its substantive breach of contract claims against Hartwell and H. Farms.  We find that it was.  The second issue is whether Fannin was entitled to summary judgment against HHH on its claims that HHH was jointly and severally liable with Hartwell and H. Farms as their alter ego.  Because Fannin is required to prove that Hartwell acted with "dishonesty of purpose or intent to deceive," *Fin. & Feather Club v. Leander*, 415 S.W.3d 548, 556 (Tex. App.—Texarkana 2013, pet. denied), and because intent to deceive is a fact issue that is dependent upon the credibility of the witness testimony, we find that a fact issue exists that precluded entry of summary judgment on Fannin's alter ego claims against HHH. Finally, the third issue is whether Fannin was entitled to summary judgment on its attorney fees claim against the Hartwell parties.  Because we find that the trial court considered the Hartwell Parties' first amended response to Fannin's motion for summary judgment, and because that response successfully controverted the reasonableness and necessity of certain attorney fees claimed by Fannin, we find that a fact issue exists that precluded entry of summary judgment.

Accordingly, we affirm the trial court's order granting Fannin's motion for summary judgment on its substantive claims for breach of contract against Hartwell and H. Farms and reverse the trial court's order granting summary judgment on Fannin's motion for summary

16

judgment on its alter ego claim against HHH as well as the trial court's order granting summary judgment on Fannin's motion for summary judgment on its claims for attorney fees against the Hartwell parties. We remand Fannin's alter ego and attorney fees claims to the trial court for further proceedings. We discuss the reasoning behind our rulings more particularly below.

**B.** **The Trial Court Did Not Err in Granting Summary Judgment on Fannin's Breach of Contract Claims**

Fannin presented undisputed evidence that (1) Hartwell signed Note One on behalf of H. Farms on March 28, 2014, (2) Note One matured on February 15, 2015, and (3) H. Farms failed to pay the outstanding principal and interest on Note One by the maturity date. Fannin presented evidence that it fully advanced the maximum amount of $750,000.00 on April 1, 2014, and several payments were made after that and were applied to the outstanding balance as follows:

- May 6, 2015, payment of $5,198.20

- June 29, 2015, payment of $1,400.00

- July 30, 2015, payment of $1,305.00

- "May 9, 2018, payment of the proceeds from the settlement between Hartwell, Lone Star and Fannin in the amount of $125,000.00."

Fannin's evidence included the following interest calculations on Note One, accounting for reductions in principal:

17

- "Balance of $557,489.83 from 03/28/2014 through 04/01/2014 at 6.5%=$397.12"

- "Balance of $750,000.00 from 04/02/2014 to 02/15/2015 at 6.50%=$42,606.16"

- "Balance of $750,000.00 from 02/16/2015 to 05/06/2015 at 18.0%=$29,219.18"[15]

- "Balance of $744,801.80 from 05/07/15 to 06/29/2015 at 18.0%=$19,466.87"

- "Balance of $743,401.80 from 06/30/15 to 07/30/15 at 18.0%=$10,998.27"

- "Balance of $742,096.80 from 07/31/15 to 05/09/18 at 18.0%=$370,723.09"

- "Balance of $617,096.80 from 05/10/18 to 12/07/19 at 18.0%=$174,984.98"

The total amount of accrued interest from December 7, 2019, was $648,699.01, with interest accruing at a rate of eighteen percent, or $304.32 per day, until paid.[16]

The Hartwell Parties maintain that those calculations amounted to conclusory statements by Darwin because they were unsupported by evidence such as bank ledgers, loan records, or other similar evidence. To prevail on its summary judgment claim on Note One,[17] Fannin was required to "prove the note in question, that the defendant signed the note, that the plaintiff is the legal owner and holder of the note, and that a certain balance is due and owing on the note." *TrueStar Petroleum Corp. v. Eagle Oil & Gas Co.*, 323 S.W.3d 316, 319 (Tex. App.—Dallas 2010, no pet.) (citing *Clark v. Dedina*, 658 S.W.2d 293, 295 (Tex. App.—Houston [1st Dist.]

---

[15]In accordance with the terms of this Note, the post-maturity interest rate of eighteen percent was applied after the February 15, 2015, maturity date.

[16]The listed payments and interest calculations were set forth in Darwin's declaration.

[17]The Hartwell parties do not dispute the summary judgment evidence offered in support of Note Two, which established that (1) Hartwell executed a promissory note in the original principal amount of $129,445.73 on August 19, 2014, on behalf of H. Farms; (2) Note Two matured on January 31, 2015; (3) H. Farms made no payments on Note Two; (4) when Note Two matured, the outstanding principal balance was $129,445.73, and that amount was accruing interest at the rate of 7.75%; (5) total accrued interest as of December 6, 2019, was $53,922.26; and (6) interest continued to accrue at the rate of $27.87 per day until paid.

18

1983, writ dism'd)). A lender is not required to "file detailed proof [of] the calculations reflecting the balance due on a note; an affidavit by a bank employee which sets forth the total balance due on a note is sufficient to sustain an award of summary judgment." *Energico Prod., Inc. v. Frost Nat'l Bank*, No. 02-11-00148-CV, 2012 WL 254093, at *5 (Tex. App.—Fort Worth Jan. 26, 2012, pets. denied) (mem. op.) (citing *Hudspeth v. Inv. Collection Servs. Ltd. P'ship*, 985 S.W.2d 477, 479 (Tex. App.—San Antonio 1998, no pet.); *Martin v. First Rep. Bank Fort Worth*, 799 S.W.2d 482, 485 (Tex. App.—Fort Worth 1990, writ denied)).

Darwin's declaration attached to Fannin's motion for summary judgment stated that, as a loan officer with Fannin, she had the primary responsibility for preparation of the loan documents and closing the loans between Fannin, Hartwell, and H. Farms. She stated that H. Farms executed Note One "on March 28, 2014, in the original principal amount of $750,000.00 payable to the order of Fannin." Darwin witnessed Hartwell sign Note One on behalf of H. Farms. Note One matured on February 15, 2015. Darwin listed all payments made on Note One, as well as the interest owing on Note One, taking into account the reductions in principal based on those payments, all as set forth above. Darwin explained that, in accordance with the terms of Note One, a post-maturity interest rate of eighteen percent was applied after the February 15, 2015, maturity date and that the total amount of accrued interest due as of December 6, 2019, was $648,395.67. The remaining unpaid principal balance of Note One was $617,096.80 as of the date of the declaration—December 9, 2019. Darwin declared that interest on Note One would continue to accrue at the rate of eighteen percent or $304.32 per day until paid.

19

Darwin's declaration supported Fannin's entitlement to summary judgment because it proved (1) the note in question, (2) that Hartwell signed the note on behalf of H. Farms, (3) that Fannin was the legal owner and holder of Note One, and (4) that a certain balance was due and owing on Note One.[18] *See TrueStar Petroleum Corp.*, 323 S.W.3d at 319; *Energico Prod., Inc.*, 2012 WL 254093, at *5; *Graf v. Sheffield Capital Corp.*, No. 05-99-01958-CV, 2001 WL 328676, at *3 (Tex. App.—Dallas Apr. 5, 2001, pet. denied) (mem. op.) ("Absent controverting evidence, affidavit testimony that one is the lawful owner and holder of a note together with a true and correct copy of the note proves ownership for summary judgment purposes." (citing *Zarges v. Bevan*, 652 S.W.2d 368, 369 (Tex. 1983) (per curiam))).

Once this proof was presented, the burden shifted to the Hartwell Parties to present evidence raising a genuine issue of material fact. *See Chavez v. Kansas City S. Ry. Co.*, 520 S.W.3d 898, 900 (Tex. 2017) (per curiam); *Brown*, 2015 WL 2437519, at *2. The Hartwell Parties attack Fannin's evidence as conclusory because it is not supported by bank ledgers—which is not legally required—and complain that, because an FSA loss claim principal payment and interest payment to Fannin on March 23, 2016, was not applied to reduce the principal of Note One, a fact question on the amount owed on Note One was thereby created. We disagree.

The summary judgment evidence reflects that, as of December 14, 2016, the current principal balance shown on the loan printout for Note One was $172,748.45. The evidence further indicated that there was an "FSA loss claim principal payment" on March 23, 2016, in the

---

[18]Darwin's declaration also proved, with respect to Note Two, (1) the note in question, (2) that Hartwell signed the note on behalf of H. Farms, (3) that Fannin was the legal owner and holder of Note Two, and (4) that a certain balance was due and owing on Note Two. The Harwell Parties presented no evidence to controvert this proof.

amount of $569,348.35 and an "FSA loss claim interest payment" on March 23, 2016, in the amount of $96,901.67. Added to the amount owed was "[i]nterest accrued without consideration of loss claim principal payment" of $36,505.06, for a total amount owed as of December 14, 2016, of $875,503.53. The Hartwell Parties explain in their brief that the loan printout and a one-page summary "with a copy of a tape run with respect to some calculations made on an adding machine" reflect the principal and interest payments of the FSA; yet, neither the motion for summary judgment nor the Darwin Declaration explain the "much lower loan balance [or] the 3/23/16 Payments." As a result, the Hartwell Parties claim, Darwin's calculations showing a balance of $742,096.80 on Note One owed for the period of "7/31/15 to 5/9/18 @ 18.0%-- $370,723.09" and "the post-maturity interest rate of 18% has been applied after the maturity date of February 15, 2015" are merely conclusory.

The Hartwell Parties further contend that, "for purposes of fabricating a balance allegedly owed by Hartwell Farms, Darwin inexplicably added the amount of the 3/23/16 Payments to the principal balance owned by Hartwell Farms at the time according to the Loan Printout." According to the Hartwell Parties:

> Therefore, the record shows that Darwin was fully aware that, as of December 14, 2016, Fannin had received the 3/23/16 Payments, which had been applied by Fannin to reduce the principal balance of the First Note to $181,214.30, and then, with no explanation, Darwin added the amount of the 3/23/16 Payments to the principal balance owed by Hartwell Farms per the Loan Printout, and then, to add insult to injury, charged Hartwell Farms 18% interest on a fictionally inflated debt as though the 3/23/16 Payments were never made to Fannin (which constitutes usury).

21

In her deposition, Darwin explained that the printout of H. Farms loan number 514780 (Note One) was the FSA guaranteed loan.[19] Darwin prepared exhibit three, which was the calculation of the amount owed through December 14, 2016. Exhibit three was a printout of the account Darwin generated from Fannin's core accounting system. It read:

Amount owed as of 12/14/16-Hartwell Farms, LLC Loan #514780

| | | |
|---|---|---|
| Current principal balance shown on loan printout: | | $172,748.45 |
| FSA loss claim principal payment on 3/23/16 | + | $569,348.35 |
| FSA loss claim interest payment on 3/26/16 | + | $ 96,901.67 |
| Interest accrued without consideration of loss claim principal payment (3/23/16 to 12/14/16) | + | $ 36,505.06 |
| Total amount owed as of 12/14/16 | | $875,503.53 |

Although Fannin admittedly did not deduct the FSA loss claim principal and interest payments from the amount due on Note One, that omission did not create a fact issue regarding the amount H. Farms owed on Note One. This is because the FSA payments did not release H. Farms of its liability to Fannin to pay Note One. Title 7 of the Code of Federal Regulations, Section 762.149(i)(1), requires the lender—in this case Fannin—to continue to be responsible for collecting the debt after a loss claim payment by the FSA has been made. This section states:

> (i)    Final loss claims.
>
>> (1)    Lenders must submit a final loss claim when the security has been liquidated and all proceeds have been received and applied to the account. All proceeds must be applied to principal first and then toward accrued interest if the interest is still accruing. The application of the loss claim payment to the account does not automatically release the borrower of

---

[19]The FSA loan guarantee guaranteed ninety percent of the principal amount of Note One, or $675,000.00.

> liability for any portion of the borrower's debt to the lender. The lender will continue to be responsible for collecting the full amount of the debt and sharing these future recoveries with the Agency in accordance with paragraph (j) of this section.

7 C.F.R. § 762.149(i)(1) (West, Westlaw through Oct. 7, 2021). Paragraph (j) requires the lender to "remit any recoveries made on the account after the Agency's payment of a final loss claim to the Agency in proportion to the percentage of guarantee . . . until the account is paid in full or otherwise satisfied." 7 C.F.R. § 762.149(j) (West, Westlaw through Oct. 7, 2021). As explained by the Fifth Circuit, "the FSA's repurchasing the guaranteed portion of [a] note is not an event that affects [the debtor's] obligations to the bank." *FDIC v. Davis*, No. 01-40553, 2002 WL 1396930, at *1 (5th Cir. June 5, 2002) (per curiam). Instead, the debtor "must continue paying the bank . . . whether the FSA reacquires the guaranteed portion of [the debtor's] loan or not." *Id.* Because H. Farms was legally obligated to pay its debt to Fannin despite the FSA loss claim principal and interest payments, the fact that those payments were added back to the amount the Hartwell Parties owed Fannin did not create a fact issue as the Hartwell Parties suggest.

In their reply brief, though, the Hartwell Parties suggest that interest should not have been calculated on the debt they owed to Fannin. In support of this contention, they rely on Title 7, Section 762.149(d)(2), of the Code of Federal Regulations, which provides,

> The lender will discontinue interest accrual on the defaulted loan at the time the estimated loss claim is paid by the Agency. The Agency will not pay interest beyond 210 days from the payment due date. If the lender estimates that there will be no loss after considering the costs of liquidation, an estimated loss of zero will be submitted and interest accrual will cease upon the approval of the estimated loss and never later than 210 days from the payment due date . . . .

23

7 C.F.R. § 762.149(d)(2) (West, Westlaw through Oct. 7, 2021). Because this provision pertains to the payment of an estimated loss claim, rather than a final loss claim, it does not apply. Nothing in the record reflects that the FSA paid an estimated loss claim. There is no similar provision relating to the payment of a final loss claim. Even assuming that the FSA paid an estimated loss claim, this section applies to a discontinuation of interest for which the FSA, not the borrower, is responsible.

Because the summary judgment evidence established that H. Farms defaulted on Notes One and Two, the trial court did not err in granting summary judgment on Fannin's breach of contract claims. As a result, Hartwell is liable on his guaranties of Notes One and Two.[20] *See Lee v. Martin Marietta Materials Sw., Ltd.*, 141 S.W.3d 719, 720–21 (Tex. App.—San Antonio 2004, no pet.) (to recover under guaranty contract, plaintiff must show existence and ownership of guaranty contract, terms of underlying contract, occurrence of conditions upon which liability is based, and guarantor's failure or refusal to perform on promise).[21]

### C. The Trial Court Erred in Granting Summary Judgment on Fannin's Sham and Alter Ego Claims

Fannin's traditional motion for summary judgment alleged that HHH was jointly and severally liable to it as the alter ego of H. Farms and Hartwell. In support of this claim, Fannin produced summary judgment evidence that Hartwell was the sole member of H. Farms and was

[20]Hartwell contends that the trial court erred by failing to construe the guaranty executed in connection with Note Two as to limit Hartwell's liability on all debts owed to Fannin to the dollar amount stated in that guaranty. Because we find a fact issue with respect to Fannin's sham and alter ego claim, we decline to address this issue.

[21]The summary judgment evidence proved, with respect to both guaranties, (1) the existence of each guaranty, (2) ownership of each guaranty contract, (3) the terms of the underlying contracts on which the guaranties were based, (4) the occurrence of conditions on which liability was based, and (5) that Hartwell failed or refused to perform on the guaranties.

24

likewise the sole member of HHH. Hartwell formed HHH in early September 2014, after he signed Notes One and Two on behalf of H. Farms. After Hartwell formed HHH, he transferred equipment from H. Farms to HHH, assumed all the leases H. Farms previously leased, and began farming exclusively under the HHH entity—thereby rendering H. Farms a shell. Hartwell never informed Fannin that he created HHH and began farming exclusively under HHH.[22] When H. Farms filed for bankruptcy, Hartwell claimed that it had no cash and that the 775 acres of wheat that had been planted were owned by HHH. Fannin claimed that this course of events was designed to avoid Hartwell's debt to Fannin. As a result, Fannin claimed that HHH should be jointly and severally liable to Fannin for the debts of H. Farms. The trial court granted the requested relief.[23]

Under Section 101.101(a) of the Texas Business Organizations Code, "a member or manager of a limited liability company is not liable for the company's debts, obligations, or liabilities except to the extent the company agreement specifically provides otherwise." *Fin & Feather Club*, 415 S.W.3d at 556; *see* TEX. BUS. ORGS. CODE ANN. §§ 101.104, 101.114; *see also* TEX. BUS. ORGS. CODE ANN. § 101.113. "The statutory protections afforded to members and managers of an LLC give way only when a plaintiff can show that the LLC was used for the purpose of perpetrating, and did perpetrate, an actual fraud for the member or the manager's direct personal benefit." *Fin & Feather Club*, 415 S.W.3d at 556 (policies governing piercing

---

[22]H. Farms agreed that it would "obtain [Fannin's] written consent before organizing, merging into, or consolidating with an entity; acquiring all or substantially all the assets of another; [or] materially changing [its] legal structure, management, ownership or financial condition."

[23]Veil-piercing doctrines are a means of imposing corporate liability for an underlying cause of action on an individual and are not substantive causes of action. *Crooks v. M1 Real Estate Partners, Ltd.*, 238 S.W.3d 474, 488 (Tex. App.—Dallas 2007, pet. denied).

veil of corporation also apply to limited liability companies) (citing *Shook v. Walden*, 368 S.W.3d 604, 621 (Tex. App.—Austin 2012, pet. denied)); *see* TEX. BUS. ORGS. CODE ANN. § 21.223(b) ("Subsection (a)(2) does not prevent or limit the liability of a holder . . . if the obligee demonstrates that the holder . . . caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder . . . .").

Although the term "actual fraud" is not defined in the statute, we have construed this term as "dishonesty of purpose or intent to deceive." *Fin & Feather Club*, 415 S.W.3d at 556[24] (citing *Menetti v. Chavers*, 974 S.W.2d 168, 174 (Tex. App.—San Antonio 1998, no pet.)); *see Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.); *Priddy v. Rawson*, 282 S.W.3d 588, 600 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *Dick's Last Resort of W. End, Inc. v. Mkt./Ross, Ltd.*, 273 S.W.3d 905, 909 (Tex. App.—Dallas 2008, pet. denied); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 387 (Tex. App.—Houston [14th Dist.] 2007, no pet.). "[I]n the context of piercing the corporate veil, actual fraud is not equivalent to the tort of fraud. Instead, in that context, actual fraud involves 'dishonesty of purpose or intent to deceive.'" *Latham*, 320 S.W.3d at 607 (quoting *Castleberry v. Branscum*, 721 S.W.2d 270, 273 (Tex. 1986), *superseded by statute on other grounds*, *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008)).

---

[24]In *Fin & Feather*, we recognized that "[e]vidence that a company was used as an alter ego does not, by itself, create an issue regarding whether it was used to commit an actual fraud on the plaintiff for the defendant's personal benefit." *Fin & Feather Club*, 415 S.W.3d at 556 (citing *Shaw v. Maddox Metal Works, Inc.*, 73 S.W.3d 472, 481 (Tex. App.—Dallas 2002, no pet.)).

26

Fannin argues that Hartwell's conduct in transferring the assets of H. Farms to HHH after he executed Notes One and Two on behalf of H. Farms, thereby rendering H. Farms a shell, as described above, established "dishonesty of purpose or intent to deceive" as a matter of law. To prove entitlement to pierce HHH's corporate veil, Fannin was required to show, as a matter of law, that Hartwell (1) used H. Farms and HHH with "dishonesty of purpose or intent to deceive" and (2) did so for his direct personal benefit. *See Fin & Feather Club*, 415 S.W.3d at 556.

In (1) considering the evidence in the light most favorable to the Hartwell Parties, (2) indulging all reasonable inferences in favor of the Hartwell Parties, and (3) resolving any doubts in their favor, we cannot conclude that each of these elements was conclusively established as a matter of law. "The . . . bas[is] for disregarding the corporate fiction involve[s] questions of fact." *Castleberry*, 721 S.W.2d at 277 (Tex. 1986). "Except in very special circumstances, fact questions should be determined by the jury." *Id.* (citing TEX. CONST. art I, § 15; *State Credit Bureau of Laredo, Inc.*, 530 S.W.2d 288, 293 (Tex. 1975)); *see Atl. Richfield Co. v. Long Trusts*, 860 S.W.2d 439, 447 (Tex. App.—Texarkana 1993, writ denied) (alter ego determination is finding of fact). Moreover, "[i]ntent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *see Logan v. Mullis*, 686 S.W.2d 605, 608 (Tex. 1985) (intent is generally "a question of fact to be decided by the jury").

We conclude that summary judgment on corporate veil piercing was not proper on this record.

27

**D.     The Trial Court Erred in Granting Summary Judgment in Favor of Fannin on its Attorney Fee Claim**

The Hartwell Parties contend that the trial court erred by awarding attorney fees to Fannin when attorney fees were (1) not requested in Fannin's motion for summary judgment, (2) were contested by the Hartwell Parties, and (3) were not segregated as required by law.

**1.     Fannin's Motion for Summary Judgment Stated Grounds for Recovery of Attorney Fees**

The Hartwell Parties complain that, because a request for attorney fees is absent from Fannin's motion for summary judgment, the trial court erred in awarding fees. "Specific grounds for summary judgment must be expressly stated in the motion for summary judgment itself and not . . . in the summary judgment evidence . . . ." *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 339 (Tex. 1993). Summary judgment cannot be granted except on the grounds expressly presented in the motion. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 204 (Tex. 2002). We, likewise, cannot affirm a summary judgment based on grounds not stated in the motion. *See id.*

Fannin's traditional motion for summary judgment sought judgment on its affirmative claim for breach of contract based on the Hartwell Parties' default on Notes One and Two. In addition, Fannin's motion stated that the commercial loan agreement (executed in conjunction with Note One), Note Two, and both guaranties "provide that Fannin [could] recover attorney's fees for the cost of collection on the Notes." The motion was supported by, among other things, the declaration of Steven Aldous (Aldous Declaration) and the attachments thereto. The Aldous Declaration describes counsel's billing statements and legal work in the present case.

28

Review of Fannin's motion for summary judgment, as outlined above, reflects that it included a clear statement of a ground for the recovery of attorney fees and a clear indication that that ground provided Fannin with the ability to recover attorney fees. *Cf. Stephens & Johnson Operating Co. v. Schroeder*, No. 04-14-00167-CV, 2015 WL 4760029, at \*6 (Tex. App.—San Antonio Aug. 12, 2015, pet. denied) (mem. op.) (no request for, or statement of any ground for, the recovery of attorney fees in motion for summary judgment).

### 2. The Hartwell Parties' Contest of Attorney Fees Created a Fact Issue

"[T]he determination of the disputed fact issue of attorney's fees [is] improper in a summary judgment proceeding." *Wich v. Fleming*, 652 S.W.2d 353, 358 (Tex. 1983) (op. on reh'g); *see Affordable Motor Co. v. LNA, LLC*, 351 S.W.3d 515, 522–23 (Tex. App.—Dallas 2011, pet. denied) (trial court erred in awarding attorney fees in summary judgment proceeding when attorney fees were controverted by an affidavit from opposing counsel opining that fees claimed were excessive). Because the Hartwell Parties raised a material fact issue regarding the attorney fee award, the trial court erred in awarding attorney fees to Fannin as a matter of law. *See Affordable Motor Co.*, 351 S.W.3d at 522–23 (citing *Gen. Specialities, Inc. v. Charter Nat'l Bank-Houston*, 687 S.W.2d 772, 774 (Tex. App.—Houston [14th Dist.] 1985, no writ) (because nonmovant submitted an affidavit controverting the reasonableness of movant's attorney fees, summary judgment was not proper disposition)).

To support its request for attorney fees, Fannin submitted the Aldous Declaration, in which he opined that reasonable and necessary attorney fees incurred on behalf of Fannin totaled

29

(before appeal) $283,631.00.  The parties disagree on whether the Aldous Declaration was properly contested.[25]

Fannin contends that the Hartwell Parties failed to properly contest its attorney fee evidence because the declaration of William L. Wolf (Wolf Declaration) contesting those fees was not timely filed.  In support of this claim, Fannin points out that its motion for summary judgment was set for hearing on March 19, 2020.  Rule 166a(c) of the Texas Rules of Civil Procedure states, in relevant part, "Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response."  TEX. R. CIV. P. 166a(c).  It is undisputed that Hartwell's timely-filed response to Fannin's motion for summary judgment of March 12, 2020, did not include the Wolf Declaration or any evidence contesting the propriety of attorney fees.

On April 8, 2020, the Hartwell Parties filed their first amended response to Fannin's traditional and no-evidence motion for summary judgment, which response included the unsworn Wolf Declaration contesting the Aldous Declaration in support of Fannin's attorney fees.  Fannin argues that, because the April 8, 2020, amended response was untimely and the record is devoid of any indication that the late-filed summary judgment evidence was filed with leave of court, we should presume that the trial court did not consider it.  *See Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 688 (Tex. 2002) (setting forth requirements to obtain leave to file late summary judgment evidence); *INA of Tex. v. Bryant*, 686 S.W.2d 614, 615 (Tex. 1985)

---

[25]The Hartwell Parties do not contend that the Aldous Declaration and the attachments thereto were not competent summary judgment evidence.

30

(presuming that trial court did not consider late-filed response to motion for summary judgment when nothing appeared of record to indicate response was filed with leave of court).

We must, however, examine the record for "an affirmative indication that the trial court permitted the late filing." *B.C. v. Steak N Shake Operations, Inc.*, 598 S.W.3d 256, 259 (Tex. 2020) (per curiam) (quoting *Pipkin v. Kroger Tex., L.P.*, 383 S.W.3d 655, 663 (Tex. App.— Houston [14th Dist.] 2012, pet denied)). "That indication may arise from 'a separate order, a recital in the summary judgment, or an oral ruling contained in the reporter's record of the summary judgment hearing.'" *Id.* at 259–60 (quoting *Alphaville Ventures, Inc. v. First Bank*, 429 S.W.3d 150, 154 (Tex. App.—Houston [14th Dist.] 2014, no pet.)). Having conducted such an examination, we find that the trial court's summary judgment order clearly indicates that it considered the Hartwell Parties' amended response to Fannin's motion for summary judgment. As a result, we do not presume otherwise.[26] The final summary judgment stated,

> The court has under consideration Fannin Bank's Traditional and No-Evidence Motion for Summary Judgment. The Court considered the motion by submission. The Court reviewed and considered the motion and attached evidence, Defendants' First Amended Response to Plaintiff's Traditional and No-Evidence Motion for Summary Judgment and attached evidence, and the pleadings. Based upon the foregoing, the Court hereby renders judgment for Plaintiff Fannin Bank.

In his declaration, Wolf opined that the fees for legal work set forth in the Aldous Declaration were not reasonable or necessary with respect to

---

[26]The Hartwell Parties further claim that the trial court explicitly allowed them to submit the amended response on April 8, 2020, as evidenced by an email from the trial court attached to the Hartwell Parties' reply brief filed in this Court. The email, however, is not included in the clerk's record on file with this Court and does not include a file-mark. "[W]ith limited exceptions not material here, an appellate court may not consider matters outside the appellate record." *Merch. Ctr., Inc. v. WNS, Inc.*, 85 S.W.3d 389, 394 (Tex. App.—Texarkana 2002, no pet.) (citing *Sabine Offshore Serv., Inc. v. City of Port Arthur*, 595 S.W.2d 840 (Tex. 1979) (per curiam)). There is no indication in the record that the trial court assigned a different submission date after March 19, 2020.

31

Fannin filing 2 substantially identical cases which ended up with all of the Defendants as parties to this later filed litigation (the "Second Lawsuit"), with the earlier filed lawsuit [the "First Lawsuit"] constituting a waste of time and money . . . . the description of services rendered in the First Lawsuit . . . are substantially similar, and in many respects identical, to the description of services rendered in the Second lawsuit . . . .

. . . . The Valley Feed garnishment . . . was wrongful and hence dissolved by the Court after being granted ex parte.

. . . . The preparation and appearance at a jury trial on January 6, 2020, whereby Fannin sought and obtained postponement by the Court to address the recently filed (i) MSJ and (ii) motion to strike jury trial . . . filed . . . just prior to such jury trial.

Wolf further opined,

[B]oth Guarantys [sic] provide for attorneys' fees incurred with respect to the collection of those Guarantys [sic], not legal fees with respect to the many far-flung endeavors in multiple courts described in the Aldous Declaration. The Gurantys [sic] could have been, and are now, the subject of a rather simple motion for summary judgment for the Court to interpret, as a matter of law, the terms of the contract and liability limits thereof. Per . . . the Aldous Declaration, the MSJ took 25 hours to prepare, including all related documents, at $400 per hour, which I agree is a reasonable hourly rate.

. . . .

. . . . [T]o the extent Fannin is entitled to any award of attorneys' fees . . . a reasonable fee to seek recovery from Hartwell (individually) with respect to the Guarantys [sic] . . . would be no more than $16,000.00 (25 hours times $400.00 per hour for preparation of the MSJ and no more than an additional 15 hours at $400.00 per hour to prepare the Second Lawsuit with respect to its claims against Hartwell and other miscellaneous litigation matters needed to get the MSJ against Hartwell to a ruling by the Court).

We conclude that the Wolf Declaration properly controverted the reasonableness and necessity of certain attorney fees claimed by Fannin. *See Affordable Motor Co.*, 351 S.W.3d at 522–23. "[T]he determination of the disputed fact issue of attorney's fees [is] improper in a

summary judgment proceeding." *Wich*, 652 S.W.2d at 358. Because a genuine issue of material fact existed with respect to the reasonableness and necessity of Fannin's attorney fees, we conclude that the trial court erred in granting summary judgment in favor of Fannin on its attorney fee claim.[27]

## Part II—The Hartwell Parties' Counterclaims

### IV. The Trial Court Properly Granted Summary Judgment to Fannin on All of the Hartwell Parties' Counterclaims

#### A. Introduction

The Hartwell Parties raised several counterclaims against Fannin. Specifically, the Hartwell Parties alleged claims of (1) wrongful garnishment, (2) breach of contract/wrongful acceleration, (3) violations of the DTPA, (4) tortious interference with an existing contract, and (5) usury. Fannin's traditional and no-evidence motions for summary judgment were both aimed at the Hartwell Parties' counterclaims. The trial court's judgment ordered "that Defendants Waymon Scott Hartwell, Hartwell Farms, LLC, or HHH Farms, LLC, take nothing from Plaintiff Fannin Bank on any counterclaims." As a result, we initially examine the no-evidence motion to determine if the trial court was correct in granting it. *See Estate of Grogan*, 595 S.W.3d 807, 812 (Tex. App.—Texarkana 2020, no pet.) (on review of both traditional and no-evidence summary judgments, we look first at the no-evidence motion). However, if the application of the Rule 166a(c) standard would be dispositive, we undertake that review in the interest of efficacy.

---

[27]Because we conclude that a fact issue exists with respect to the attorney fee award, we need not address the Hartwell Parties' complaints that the fees were not segregated as required by law.

33

*See Schuetz v. Source One Mortg. Servs. Corp.*, No. 03-15-00522-CV, 2016 WL 4628048, at *2 (Tex. App.—Austin Sept. 1, 2016, no pet.) (mem. op).

The Hartwell Parties contend that, because more than a scintilla of evidence exists to support the elements of each of its counterclaims, the trial court improperly granted summary judgment. Because we find that less than a scintilla of evidence supported the Hartwell Parties' claims for wrongful garnishment, breach of contract, and wrongful acceleration, we affirm the trial court's order granting summary judgment on those claims. Because we find that the Hartwell Parties do not constitute consumers for purposes of the DTPA as a matter of law, we affirm the trial court's order granting Fannin's traditional motion for summary judgment on those DTPA claims. Because the Hartwell Parties base their tortious interference claims on their claims that the wrongful garnishment constituted willful and intentional interference, and because we find that there is no evidence supporting the Hartwell Parties' wrongful garnishment claim, we find that the trial court properly granted Fannin's motion for summary judgment on the Hartwell Parties' tortious interference with contract claim. Finally, because we find that the Hartwell Parties' usury claim is precluded as a matter of law by our finding that the trial court's summary judgment on Fannin's substantive breach of contract claims against the Hartwell Parties was proper, we affirm the trial court's summary judgment on the usury claims as well. The reasons for our conclusions are as follows.

### B.    Standard of Review

"If a motion for summary judgment claims that there is no evidence supporting any element of a claim or defense on which the nonmovant bears the burden of proof at trial, we look

34

to see if the nonmoving party has presented evidence raising a genuine issue of material fact on the elements in question." *Id.* (citing TEX. R. CIV. P. 166a(i); *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (per curiam); *In re Estate of Fisher*, No. 06-14-00029-CV, 2014 WL 5465869, at *1 (Tex. App.—Texarkana Oct. 29, 2014, no pet.) (mem. op.)).

"A no-evidence summary judgment is essentially a pretrial directed verdict. Therefore, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict." *Seidler v. Morgan*, 277 S.W.3d 549, 552 (Tex. App.—Texarkana 2009, pet. denied) (citing *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002)). "We must determine whether the nonmovant produced any evidence of probative force to raise a fact issue on the material questions presented." *Id.* at 552–53 (citing *Rodriguez*, 92 S.W.3d at 506; *Woodruff v. Wright*, 51 S.W.3d 727, 734 (Tex. App.—Texarkana 2001, pet. denied)). "A nonmovant will defeat a no-evidence summary judgment motion if the nonmovant presents more than a scintilla of probative evidence on each element of his or her claim." *Id.* at 553 (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)); *see Rhine v. Priority One Ins. Co.*, 411 S.W.3d 651, 657 (Tex. App.—Texarkana 2013, no pet.). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion.'" *Galindo v. Snoddy*, 415 S.W.3d 905, 911–12 (Tex. App.—Texarkana 2013, no pet.) (quoting *Chapman*, 118 S.W.3d at 751).

### C. No Error in Granting Summary Judgment Against the Hartwell Parties on their Wrongful Garnishment Counterclaim

In its March 2020 counterclaim, the Hartwell Parties counterclaimed for wrongful garnishment, stating, "In a separate cause number before this Court, Plaintiff attempted a

wrongful garnishment of Hartwell Defendants' proceeds from an unrelated third-party, thereby tortiously interfering with one or more Hartwell Defendants' livelihood and business." More specifically, the Hartwell Parties claimed that Fannin's September 1, 2016, garnishment "resulted in Valley Feed Mill (Valley Feed) refusing to remit sales proceeds to HHH of over $300,000.00 for crops HHH" sold through Valley Feed. The Hartwell parties claimed that the unremitted "sales proceeds were earmarked to be used by HHH to pay off a loan to Lone Star which became due on October 1, 2016." The sales proceeds were ultimately paid to Valley Seed several months after September 1, 2016, after the trial court dissolved the garnishment. As a result of the delay caused by the garnishment, the Hartwell Parties claim that Lonestar sued HHH and Hartwell for default on the note.

"A garnishment is generally considered to be wrongful when false statements of fact are made in the affidavit prescribed by Civil Practice and Remedies Code section 63.001." *Petroleum Workers Union of the Republic of Mexico v. Gomez*, 503 S.W.3d 9, 38 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (citing *Cadle Co. v. Davis*, No. 04-09-00763-CV, 2010 WL 5545389, at *7 n.4 (Tex. App.—San Antonio Dec. 29, 2010, pet. denied) (mem. op.) (citing *Jamison v. Nat'l Loan Inv'rs, L.P.*, 4 S.W.3d 465, 468 (Tex. App.—Houston [1st Dist.] 1999, pet. denied))). Section 63.001 of the Texas Civil Practice and Remedies Code provides that "[a] writ of garnishment is available if . . . a plaintiff sues for a debt and makes an affidavit stating that . . . the debt is just, due, and unpaid . . . [and] the defendant does not possess property in Texas subject to execution sufficient to satisfy the debt . . . and . . . the garnishment is not sought to injure the defendant or the garnishee." TEX. CIV. PRAC. & REM. CODE ANN. § 63.001(2).

36

The Hartwell Parties contend that Darwin's September 1, 2016, affidavit in support of Fannin's application for a writ of garnishment contained multiple false statements. Those alleged false statements are as follows:

**1.     The Darwin Affidavit referenced exhibits A–F "allegedly attached to the Affidavit," but no such exhibits were attached.**

Fannin concedes that the Darwin affidavit attached to its motion for summary judgment did not include the referenced exhibits. It claims, though, that the Hartwell Parties failed to present evidence that the Darwin affidavit attached to the petition for a writ of garnishment failed to contain the referenced exhibits. No such evidence was presented. As a result, there is no evidence that this statement is false.

**2.     Paragraph 8 fails to truthfully disclose that Hartwell's Guaranty of Note One is capped.**

This point is without merit. It is not a false statement, but is instead a legal argument advanced by counsel for the Hartwell Parties that is subject to legal debate. In addition, there is no evidence that Darwin believed that the guaranty was capped and failed to disclose that information.

**3.     Paragraph 8 fails to truthfully disclose that Hartwell's guaranty of Note Two is capped.**

This point is without merit for the same reasons as point 2 above.

**4.     Paragraph 9 falsely claims that Notes One and Two prohibit Hartwell and H. Farms from creating a new entity without Fannin's consent.**

This point is without merit. Note Two states, "Without your prior written consent, I do not and will not use any other name and will preserve my existing name, trade names and

37

franchises." Under the default section of Note Two, it states that a default occurs if "[w]ithout [Fannin's] written consent, [Hartwell] organize[s], merge[s] into, or consolidate[s] with an entity." Further, the note provides that default occurs if, "[Hartwell] change[s his] name or assume[s] an additional name without notifying [Fannin] before making such change." The same language is in the commercial loan agreement that is part of Note One.

**5. Paragraph 12 falsely claims that the outstanding principal and interest due on Notes One and Two was $1,011,551.28 because the FSA made payments to Fannin of $666,250.02 on March 23, 2016.**

This claim is without merit. This is a legal argument that is subject to debate. Moreover, regardless of whether this legal argument is correct, there is no evidence that Darwin believed that the outstanding principal and interest on the notes was incorrect.

Because there is less than a scintilla of evidence that the garnishment was wrongful, the trial court correctly granted Fannin's no-evidence motion for summary judgment on this claim.

**D. No Error in Granting Summary Judgment Against the Hartwell Parties on Breach of Contract/Wrongful Acceleration Counterclaim**

The contracts at issue are Notes One and Two. The Hartwell Parties claim that Fannin breached both contracts based on two letters dated November 20, 2014, from Fannin's counsel to the Hartwell parties. The letters were captioned "Notice to Accelerate and Demand for Performance Pursuant to Loan Documents." Both letters stated that the borrower was in default under the terms of the respective notes, security agreements, and list of potential buyers executed in connection with the respective notes and security agreements. The letters claimed that the noteholder failed to provide Fannin written notice of the identity of the buyer at least seven days prior to the sale of the crops and further failed to account to Fannin for the proceeds of the sale of

38

the crops within ten days after the sale. Each letter made demand that the borrower provide Fannin with an accounting of the sale of the crops, including the name and address of the buyer, the date of sale, and the sale tickets that indicated the amount of the sale, within eleven days from the date of each respective letter. Each letter further advised that the failure to cure the described event of default would result in Fannin's acceleration of the notes, making "the entire unpaid principal balance plus all unpaid accrued and earned interest . . . immediately due and payable."

The Hartwell Parties contend that, because H. Farms provided Fannin with a potential list of buyers that included Wolfe City, it was not required to give special notice of the buyer to Fannin. They claim that, even though they sold to an approved buyer—thereby exempting them from the special notice provision—Fannin nevertheless wrongfully accelerated both notes. Indeed, the Hartwell Parties' summary judgment response dated March 28, 2014, includes a list of potential buyers, which included Wolfe City. This list of potential buyers referenced loan number 514780, which we have referred to as Note One. There is no evidence of a list of potential buyers associated with Note Two.

Nevertheless, this argument is without merit because neither of the two notes were called into default until after their respective expiration dates of February 15, 2015 (Note One) and January 31, 2015 (Note Two). Fannin's summary judgment included two letters dated February 25, 2015, from Fannin's counsel to H. Farms and Hartwell advising that the respective notes had matured and that the remaining principal balance plus accrued interest was due and owing. In addition, Darwin testified, "Fannin Bank did not accelerate the indebtedness evidenced by Note

39

# 1 and Note # 2. Rather, the Notes reached maturity and Hartwell Farms refused to pay the amounts due at maturity." There is no controverting evidence.

Because there is less than a scintilla of evidence establishing the Hartwell Parties' breach of contract and wrongful acceleration claims, the trial court properly granted Fannin's no-evidence motion for summary judgment.

### E. No Error in Granting Summary Judgment against the Hartwell Parties on DTPA Counterclaim

Generally, the elements of a DTPA action are "(1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (citing TEX. BUS. & COM. CODE ANN. § 17.50(a)(1)). Under the DTPA, "'[c]onsumer' means an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM. CODE ANN. § 17.45(4). "[T]he goods or services sought or acquired must form the basis of the party's complaint." *Fix v. Flagstar Bank, FSB*, 242 S.W.3d 147, 159 (Tex. App.—Fort Worth 2007, pet. denied) (citing *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 351–52 (Tex. 1987)). Otherwise, "the party must look to the common law or some other statutory provision for redress." *Id.* "Whether a person meets these requirements is a question of law." *Id.* at 160 (citing *Johnson v. Walker*, 824 S.W.2d 184, 187 (Tex. App.—Fort Worth 1991, writ denied)).

"Generally, a person cannot qualify as a consumer if the underlying transaction is a pure loan because money is considered neither a good nor a service." *Id.* (citing *Riverside Nat'l Bank*

*v. Lewis*, 603 S.W.2d 169, 173–74 (Tex. 1980) (money is currency of exchange that enables holder to acquire goods, and attempt to acquire money or use of money is not an attempt to acquire services)).  When, however, a consumer borrows money "for the purpose of buying a good or service and their complaint concerns the good or service they purchased," borrowers can qualify as consumers.  *Compass Bank v. Collier*, No. 09-19-00112-CV, 2020 WL 6494213, at *12 (Tex. App.—Beaumont Nov. 5, 2020, no pet.) (mem. op.) (citing *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983) (purchaser could sue bank under DTPA for unconscionable course of conduct in foreclosing on partially constructed home because purchaser did not seek to borrow money; they sought to acquire a house); *Ebrahimi v. Caliber Home Loans, Inc.*, No. 05-18-00456-CV, 2019 WL 1615356, at *8 (Tex. App.—Dallas Apr. 15, 2019, pet. denied) (mem. op.)); *see La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 567 (Tex. 1984) (lender may be subject to DTPA claim if borrower's objective is purchase or lease of good or service).  "But a mortgagor challenging how an existing mortgage is serviced is not a consumer because the basis of the claim is 'the subsequent loan servicing and foreclosure activities, rather than the goods or services acquired in the original transaction.'" *Ebrahimi v. Caliber Home Loans, Inc.*, No. 05-18-00456-CV, 2019 WL 1615356, at *8 (Tex. App.—Dallas Apr. 15, 2019, pet. denied) (mem. op.) (citing *Rojas v. Wells Fargo Bank, N.A.*, 571 F. App'x. 274, 279 (5th Cir. 2014) (per curiam)).  Further, "[a]n activity related to a loan transaction is a 'service' for DTPA purposes only if the activity at issue is, from the plaintiff's point of view, an objective of the transaction, not merely incidental to it." *White v. Mellon Mortg. Co.*, 995 S.W.2d 795, 801 (Tex. App.—Tyler 1999, no pet.).  And, because guarantors

41

are not consumers, they do not fall within the DTPA. *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir. 1997) (citing *Kenneth H. Hughes Interests, Inc. v. Westrup*, 879 S.W.2d 229 (Tex. App.—Houston [1st Dist.] 1994, writ denied)).

Here, the Hartwell Parties complain that Fannin advised them that Fannin would not make the loan evidenced by Note One unless the loan was guaranteed by the FSA. Hartwell was advised by the FSA that he should hire an accountant with Farm Data Services, Inc. (FDS) to provide financial services needed for the FSA guaranty. This cost money, and the FSA guaranty cost Hartwell $20,000.00. Then, Fannin allegedly told Hartwell that it would make another loan for crops if Hartwell closed on Note One, but it failed to do so. Based on those facts, the Hartwell Parties claim that they are consumers under the DTPA relative to the FSA and FDS and as to Fannin because this transaction was "inextricably intertwined" with the loan evidenced by Note One. We disagree.

The loan acquired by the Hartwell Parties evidenced by Note One was simply a loan. In other words, there was no evidence that the loan was made "for the purpose of buying a good or service" or that their complaint concerned "the good or service they purchased." *Compass Bank*, 2020 WL 6494213, at *12. We further equate the FSA guaranty and corresponding charge as an incidental activity to making the loan. That is, the FSA guaranty was not "an objective of the transaction." *White*, 995 S.W.2d at 801. Such incidental activity does not equate to a service under the DTPA. *Id.*

Although Fannin cites *Quantel Business Systems v. Custom Controls Co.*, 761 S.W.2d 302, 305 (Tex. 1988), for the proposition that deceptive conduct may be actionable under the

42

DTPA if it is "inextricably intertwined" with a consumer transaction, this proposition presupposes the existence of consumer status. The Hartwell Parties cite no authority that H. Farms, Hartwell, or HHH was a consumer with respect to the FSA guarantee, and we reject this argument. As a result, we conclude that H. Farms did not qualify as a consumer under the DTPA.

Moreover, HHH was not a party to Note One and therefore would, in any event, lack consumer status. Because guarantors are not consumers under the DPTA, Hartwell was likewise not a consumer under the DTPA. *See Plumley*, 122 F.3d at 312. We, therefore, further conclude that the trial court's summary judgment in favor of Fannin on the Hartwell Parties' DTPA claim was proper.

F. **No Error in Granting Summary Judgment Against the Hartwell Parties on Tortious Interference Counterclaim**

The Texas Supreme Court has "identified the elements of tortious interference with an existing contract as: (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (citing *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)).

The Hartwell Parties contend that HHH had a contract with Valley Feed. They further claim that Fannin's alleged wrongful garnishment (as detailed above) resulted in Valley Feed's refusal to remit sales proceeds to HHH of over $300,000.00 for crops HHH had sold through Valley Feed. The Hartwell Parties claim that the garnishment was a willful and intentional act of

interference as it was based on falsehoods in the Darwin affidavit. However, because we have already concluded that the trial court correctly granted Fannin's no-evidence motion for summary judgment on the wrongful garnishment claim, there is no evidence of a willful and intentional act of interference with the Valley Feed contract. As a result, the trial court properly granted summary judgment in favor of Fannin on the Hartwell Parties' tortious interference claim.

G.       The Trial Court Did Not Err in Granting Summary Judgment on the Hartwell Parties' Usury Counterclaim

The Hartwell Parties filed their original counterclaim against Fannin on January 11, 2017, alleging claims of (1) "Breach of Contract/Wrongful Acceleration," (2) "Wrongful Garnishment," (3) "DTPA," (4) "Conversion," (5) "Tortious Interference," and (6) "Attorneys' Fees." Fannin filed its traditional and no-evidence motions for summary judgment on December 11, 2019, seeking, among other things, judgment on the Hartwell Parties' counterclaims. On March 12, 2020, the Hartwell Parties filed an amended original counterclaim that included the counterclaims set forth in its January 11, 2017, filing, as well as an additional counterclaim for usury.

The usury claim was based on the allegation that Fannin charged interest on debt without first subtracting the loss claim principal and interest payments made to it by the FSA on March 23, 2016, totaling $666,250.06. The Hartwell Parties complain that the trial court erred in granting summary judgment on their usury counterclaim because Fannin failed to seek judgment on that basis in its motion for summary judgment. Fannin concedes that, because its motion was

44

filed before the Hartwell Parties counterclaimed for usury, its motion did not seek summary judgment on the usury counterclaim.

A summary judgment "may only be granted upon grounds expressly asserted in the summary judgment motion." *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) (per curiam) (citing TEX. R. CIV. P. 166a(c)). As a result, "[g]ranting a summary judgment on a claim not addressed in the summary judgment motion . . . is, as a general rule, reversible error." *Id.* (citing *Chessher v. Sw. Bell Tel. Co.*, 658 S.W.2d 563, 564 (Tex. 1983) (per curiam)). A limited exception to this general rule exists when "the underlying motion omitted one of multiple causes of action, when the omitted ground was intertwined with, and precluded by, a ground addressed in the motion." *Id.* (citing *Zarzosa v. Flynn*, 266 S.W.3d 614, 621 (Tex. App.—El Paso 2008, no pet.) ("holding reversal would be meaningless because questioned recovery precluded as matter of law")). Under this exception, summary judgment may be affirmed if "(1) the omitted claim is precluded as a matter of law by other grounds raised in the motion or (2) the omitted claim is derivative of the addressed claim and the movant showed itself entitled to summary judgment on the addressed claim." *Kilgore Indep. Sch. Dist. v. Axberg*, 572 S.W.3d 244, 263 (Tex. App.—Texarkana 2019, pet. denied).

Fannin contends that summary judgment can be affirmed on the usury counterclaim under the foregoing exception because the usury claim was intertwined with, and precluded by, the trial court's summary judgment on the note claims. We agree. We find that the omitted claim is precluded as a matter of law by our conclusion that Fannin was not required to subtract the loss claim principal and interest payments made to it by the FSA on March 23, 2016.

45

Because the Hartwell Parties' usury counterclaim was based on the premise that Fannin was indeed required to subtract such payments prior to interest calculations, the usury counterclaim was necessarily precluded.

**Part III—The Trial Court's Summary Judgment in Favor of American**

**V.     Fannin Proved Its' Conversion Claim as a Matter of Law, but a Fact Issue Exists on American's Estoppel Claim**

**A.     Introduction**

American filed a traditional motion for summary judgment against Fannin in which it sought judgment on Fannin's claim of conversion of crop proceeds.  American claimed that Fannin's conversion claim failed because American had the lawful right to exercise control over the proceeds as (1) American was required to follow the directions of its depositor (Hartwell) regarding knowledge of a security interest and (2) American had Fannin's consent to possess the proceeds because it did not receive a revocation of consent from Fannin.  American further claimed that Fannin was estopped to claim the proceeds because (1) Fannin agreed to pay off the 2014 seed and fertilizer loan and American detrimentally relied on the representation in making the $100,000.00 loan to H. Farms and (2) Fannin was negligent in failing to notify American of its claim to the proceeds and American had no knowledge of H. Farms's default on its debt to Fannin.  Finally, American claimed—in reliance on Section 9.332 of the Business and Commerce Code—that, as transferee of money and funds, it took the money free of any security interest of Fannin, as it did not collude with Hartwell.  American further claimed that Fannin was estopped from claiming the proceeds of the wheat crop sale.

46

Fannin filed a traditional motion for summary judgment against American on Fannin's conversion and declaratory judgment claims and on American's claims for declaratory judgment. According to Fannin, Section 9.315(a)(1) of the Texas Business and Commerce Code provides that a security interest or agricultural lien continues in the collateral notwithstanding its sale or lease, unless the secured party agrees. Also, according to Fannin, Section 9.315(a)(2) provides that a security interest attaches to any identifiable proceeds from the collateral, which interest is not cut off by the Food Security Act of 1985. Fannin further claimed that American had actual and constructive knowledge that Fannin had a lien on H. Farms's crops, Fannin had not released that lien, and American accepted funds from Hartwell that it knew came from crop sales. This course of events, Fannin maintains, amounted to collusion.[28]

After considering Fannin's and American's competing motions, the trial court granted American's motion for summary judgment, decreeing that Fannin "take nothing on its claim of conversion of its collateral proceeds in the amount of $237,395.95 and that American Bank of Texas, now known as First United Bank and Trust Company[,] may maintain possession and use of said proceeds."[29] The trial court entered a separate order denying Fannin's motion for summary judgment, thereby making the earlier judgment in favor of American final and appealable.

---

[28]Although Fannin may prefer to discuss collusion, it is not relevant as the appeal can be resolved on other issues.

[29]American previously filed a motion for partial summary judgment in 2017. The trial court granted that motion, finding that there was no genuine issue of material fact as to Fannin's claim for tortious interference with contract and that American was entitled to summary judgment thereon as it had disproven at least one element of Fannin's cause of action for tortious interference with contract. Fannin raises no appellate issue with regards to the earlier partial summary judgment, and it is irrelevant to any issue before this Court.

On appeal, Fannin claims that the trial court erred when it granted American's motion for summary judgment because (1) Fannin's security interest in the H. Farms crops continued once the crops were converted to proceeds, (2) The Food Security Act of 1985 (FSA) did not cut off Fannin's security interest in the proceeds from the sale of crops, (3) Section 9.332 (relating to security interests in deposit accounts) does not insulate American from Fannin's claim to identifiable proceeds, and (4) American did not conclusively establish that Fannin was estopped from asserting its conversion claim. Fannin further claimed that the trial court erred in failing to grant summary judgment on its claims of conversion and declaratory judgment and in granting American's declaratory judgment claim. We find that Fannin proved its conversion claim as a matter of law, but a fact issue exists regarding American's claim that Fannin was estopped from asserting its' conversion claim. The reasons for our conclusions are as follows.

### B.      Fannin Proved its Conversion Claim as a Matter of Law

"Conversion is the 'unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights,'" *Stephens v. Stephens*, No. 06-19-00088-CV, 2020 WL 7330270, at *9 (Tex. App.—Texarkana Dec. 7, 2020, pet. denied) (mem. op.) (quoting *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971)), or to the "exclusion of another's *superior* rights in [the] property," *Rente Co. v. Truckers Exp., Inc.*, 116 S.W.3d 326, 332 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see Marathon Mach. Tools, Inc. v. Davis-Lynch, Inc.*, 400 S.W.3d 133, 138

(Tex. App.—Houston [14th Dist.] 2013, no pet.).[30]  Moreover, "Wrongful intent to convert another's property is not an essential element of conversion, nor is it material to any issue involved in a suit for conversion except as to the issue of exemplary damages." *Stephens*, 2020 WL 7330270, at *10 (quoting *McVea v. Verkins*, 587 S.W.2d 526, 531 (Tex. App.—Corpus Christi 1979, no writ)).

"Demand and refusal are ordinarily elements in a conversion claim." *Id.* (citing *Apple Imps., Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex. App.—Austin 1997, writ denied)).  "Yet, there are some exceptions to this general rule such as when a demand would have been useless, or the possessor's acts are a clear repudiation of the lawful owner's rights." *Id.* (citing *Bures v. First Nat'l Bank, Port Lavaca*, 806 S.W.2d 935, 938 (Tex. App.—Corpus Christi 1991, no writ)). "When the party in possession has unequivocally exercised dominion over the property inconsistent with the claims of the owner or the person who is entitled to possession, demand would be futile." *Id.* (citing *Laykin v. McFall*, 830 S.W.2d 266, 271 (Tex. App.—Amarillo 1992, no writ)).

### 1. Fannin's Security Interest Continued in the Proceeds of H Farms's Crops

To establish that it owned or was entitled to possession of the proceeds, we first determine whether Fannin's security interest continued in the proceeds of the crop sale.

---

[30]Although the Texas Business and Commerce Code does not provide a remedy for conversion of collateral, the Code preserves supplementary principles of law and equity. *See* TEX. BUS. & COM. CODE ANN. § 1.103(b) ("Unless displaced by the particular provisions of this title, the principles of law and equity . . . shall supplement its provisions.").

It is undisputed that:

- The U.S. Department of Agriculture (USDA) Farm Service filed a UCC financing statement covering all crops, livestock, farm products, and proceeds on February 17, 2011, listing H. Farms as the debtor.

- The USDA Farm Service filed a UCC financing statement on August 21, 2012, covering the same crops, livestock, farm products, and proceeds as the February 17, 2011, statement, but that statement assigned the USDA security interest in the collateral to Fannin.

- H. Farms executed Note One on March 28, 2014, which granted Fannin a security interest in inventory, equipment, farm products, government payments and programs, and other specific property. That security interest extended to "all proceeds and products from the Property."

- Fannin filed a UCC financing statement on April 1, 2014, listing H. Farms as debtor and Fannin as the secured party.[31]

- On August 18, 2014, Hartwell sold his wheat crop to Wolfe City.

- In return for the wheat, Wolfe City issued a check to Hartwell in the amount of $272,855.57.

- Hartwell deposited the check issued by Wolfe City into the H. Farms checking account at American.

- H. Farms issued a check to American from its checking account at American in the amount of $237,395.95 to pay off two seed and fertilizer loans.

- American accepted the funds and applied them to H. Farms's two seed and fertilizer loans.

---

[31]The financing statement lists the collateral as "FARM PRODUCTS AND SUPPLIES: ALL FARM PRODUCTS INCLUDING, BUT NOT LIMITED TO, ALL POULTRY AND LIVESTOCK AND THEIR YOUNG, INCLUDING AQUATIC GOODS, ALONG WITH THEIR PRODUCTS, PRODUCE, AND REPLACEMENTS; ALL CROPS, ANNUAL OR PERENNIAL, AND ALL PRODUCTS OF THE CROPS; AND ALL FEED, SEED, FERTILIZER, MEDICINES, AND OTHER SUPPLIES USED OR PRODUCED IN DEBTOR'S FARMING AND/OR AQUACULTURAL OPERATIONS."

Fannin correctly claims that, based on the security agreement embodied in Note One and the UCC financing statements, it had a perfected security interest in H. Farms's crops.[32] Fannin relies on Sections 9.315(a), subsections (1) and (2), of the Texas Business and Commerce Code in support of its corollary claim that it likewise had a perfected security interest in the proceeds from Hartwell's sale of those crops to Wolfe City. Section 9.315(a), subsections (1) and (2), provide that, with certain exceptions not applicable here, "a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien," TEX. BUS. & COM. CODE ANN. § 9.315(a)(1), and "a security interest attaches to any identifiable proceeds of collateral," TEX. BUS. & COM. CODE ANN. § 9.315(a)(2).[33]

American claims, though, that Fannin's failure to file a financing statement in the name of Hartwell (individually) meant that Fannin could not establish a security interest in the proceeds of the wheat crop sale. This argument confuses the issue of tracing proceeds with the issue of whether the security interest continued in the proceeds (even though Wolfe City issued the check to Hartwell rather than H. Farms). Section 9.315(b)(2) of the Texas Business and Commerce Code provides that "proceeds that are commingled with other property are identifiable proceeds . . . if the proceeds are not goods, to the extent that the secured party

---

[32]"An agricultural lien is perfected if it has become effective and all of the applicable requirements for perfection in Section 9.310 have been satisfied. An agricultural lien is perfected when it becomes effective if the applicable requirements are satisfied before the agricultural lien becomes effective." TEX. BUS. & COM. CODE ANN. § 9.308(b). "Except as otherwise provided in Subsection (b) and Section 9.312(b), a financing statement must be filed to perfect all security interests and agricultural liens." TEX. BUS. & COM. CODE ANN. § 9.310(a).

[33]"Proceeds" is defined, among other things, as "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral." TEX. BUS. & COM. CODE ANN. § 9.102(65)(A).

51

identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law other than this chapter with respect to commingled property of the type involved." TEX. BUS. & COM. CODE ANN. § 9.315(b)(2).

The record supports the conclusion that the funds paid by H. Farms to American were proceeds of the sale of H. Farms's wheat crop to Wolfe City. In addition, Amlin testified as follows:

> On August 18, 2014, Scott Hartwell deposited a check issued by Wolfe City Grain, Inc. into the Hartwell Farms, LLC Checking Account No. in XXXXXX6396 in the amount of $272,855.57. On the same day, Scott Hartwell on behalf of Hartwell Farms, LLC issued Check No. 3534 to ABT in the amount of $237,395.95 to pay off two seed and fertilizer loans. Exhibit 2.2, attached hereto, is a true and correct copy of Check No. 1455 from Wolfe City Grain, Inc. to Scott Hartwell in the amount of $272,855.57 which was deposited in the deposit account of Hartwell Farms, LLC Account No. XXXXXX6396. Exhibit 2.3, attached hereto, is a true and correct copy of Check No. 3534 from Hartwell Farms, LLC. Account No. XXXXXX6396 to American Bank in the amount of $237,395.95.
>
> . . . . ABT accepted the funds and applied them to Loan No. XXXXXXX026 and Loan No. XXXXXXX662. Exhibit 2.4, attached hereto, is a true and correct copy of Promissory Note for Loan No. XXXXXXX026 payable to American Bank of Texas by Hartwell Farms, LLC in the amount of $136,000.00 and Exhibit 2.5, attached hereto, is a true and correct copy of Promissory Note for Loan No. XXXXXXX662 payable to American Bank of Texas by Hartwell Farms, LLC in the amount of $100,000.00.

We conclude that the disputed proceeds were identifiable as that term is defined by Section 9.315(b)(2) of the Texas Business and Commerce Code. *See* TEX. BUS. & COM. CODE ANN. § 9.315(b)(2).[34]

---

[34]Amlin testified that he "knew in August" that the funds used to pay the seed and fertilizer notes probably came from wheat sales. He knew at the time that H. Farms "had liens by Fannin Bank for crops."

American next contends that Fannin did not perfect a priority security interest in the proceeds of the crops in reliance on Section 1631(d) of the FSA. That section reads:

**(d)    Purchases free of security interest**

Except as provided in subsection (e) and notwithstanding any other provision of Federal, State, or local law, a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller, even though the security interest is perfected; and the buyer knows of the existence of such interest.

7 U.S.C.A. § 1631(d) (West, Westlaw current through PL 117-45). Subsection (e) provides:

**(e)    Purchases subject to security interest**

A buyer of farm products takes subject to a security interest created by the seller if--

. . . .

(1)(A) within 1 year before the sale of the farm products, the buyer has received from the secured party or the seller written notice of the security interest organized according to farm products that—

(i)      is an original or reproduced copy thereof;

(ii)     contains,

(I)      the name and address of the secured party;

(II)     the name and address of the person indebted to the secured party;

(III)    the social security number, or other approved unique identifier, of the debtor or, in the case of a debtor doing business other than as an individual, the Internal Revenue Service taxpayer identification number, or other approved unique identifier, of such debtor; and

(IV)     a description of the farm products subject to the security interest created by the debtor, including the

53

amount of such products where applicable, crop year, and the name of each county or parish in which the farm products are produced or located;

(iii)    must be amended in writing, within 3 months, similarly signed, authorized, or otherwise authenticated and transmitted, to reflect material changes;

(iv)    will lapse on either the expiration period of the statement or the transmission of a notice signed, authorized, or otherwise authenticated by the secured party that the statement has lapsed, whichever occurs first; and

(v)    contains any payment obligations imposed on the buyer by the secured party as conditions for waiver or release of the security interest; and

(B)    the buyer has failed to perform the payment obligations

7 U.S.C.A. § 1631(e) (West, Westlaw current through PL 117-45).

In an effort to comply with subsection (e), Fannin provided Wolfe City with two separate notices of its security interest in H. Farms's crops. The first notice of security interest to Wolfe City from Fannin was dated November 1, 2013. That notice did not contain the Internal Revenue Service taxpayer identification number of H. Farms, a description of the farm products, the amount of the farm products, the crop year, or the county where the farm products were produced or located. Fannin provided Wolfe City with a second notice of its security interest dated March 28, 2014. That notice included the information omitted from the November notice. Darwin testified, though, that the second notice was not sent to Wolfe City until "sometime in May of 2015." Darwin testified that the notice was inadvertently backdated to March 28, 2014, because of an error in the system and an old form with that date. She further testified that she sent the notice in May 2015 even though "[they] were aware that all the crops had been sold, the

54

money had been spent." She continued, "But just as an abundance of caution in the event . . . that he did sell anything, we would have a notice of security interest out there."[35]

Fannin admits that it failed to satisfy the conditions of Section 1631(e) because its notice did not comply with that section's requirements.[36] It contends, though, that Section 1631(e) does not apply here because by its terms, it is limited to buyers of farm products. Under Texas law, Fannin had a perfected security interest in H. Farms's wheat crop sold to Wolfe City.[37] The record reflects that Wolfe City was engaged in the ordinary course of business when it purchased the wheat[38] from H. Farms, that H. Farms was engaged in farming operations, and that H. Farms was in the business of selling its crops.[39]

Those facts do not lead us to conclude that Fannin's perfected security interest in the proceeds of the sale was thereby extinguished. Indeed, Section 1631(e) specifically states that it applies to a "buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations." 7 U.S.C.A. § 1631(d). American was not such a buyer.[40] Not

---

[35]This section does not speak to the perfection of a security interest; it addresses enforcement of a perfected security interest. We reject any contention that a failure to comply with Section 1631(e) results in an unperfected security interest.

[36]"The weight of authority is that anything less than complete and precise compliance with the notice provisions of § 1631(e)(1) is insufficient." *In re Printz*, 478 B.R. 876, 883 (Bankr. C.D. Ill. 2012).

[37]Section 9.315(c) provides, "A security interest in proceeds is a perfected security interest if the interest in the original collateral was perfected." TEX. BUS. & COM. CODE ANN. § 9.315(c).

[38]Wheat is expressly designated as a farm product. 7 U.S.C.A. § 1631(c)(5) (West, Westlaw current through PL 117-45).

[39]*See* 7 U.S.C.A. § 1631(c)(1) (defining "buyer in the ordinary course of business" as "a person who, in the ordinary course of business, buys farm products from a person engaged in farming operations who is in the business of selling farm products").

[40]*See supra* note 13.

only did American not qualify as a buyer in the ordinary course of business, the statute specifically applies only to the purchase of "farm products" and says nothing about proceeds. *See In re Printz*, 478 B.R. at 883 ("The statutory protections for buyers of farm products . . . provide that the 'security interest' that such buyers take free and clear of is limited to an interest in the farm products and does not include an interest in the proceeds of those products." (citing 7 U.S.C.A. § 1631(c)(7)));[41] *see also In re Duckworth*, Adversary No. 12-08067, 2014 WL 690553, at *8 (Bankr. C.D. Ill. Feb. 21, 2014) (Food Security Act does not determine rights to proceeds of collateral; whether buyer takes free of or subject to security interest in grain, secured party still has lien on identifiable proceeds of its collateral); *Consol. Nutrition, L.C. v. IBP, Inc.*, 669 N.W.2d 126, 130–31 (S.D. 2003) (Congress "did not intend to preempt state law relating to the creation, perfection, or priority of security interests," besides "eliminating double payment for liability for a 'buyer in ordinary course' in farm products . . . application of proceeds to a preexisting contractual debt would not be protected by the priority rules of the FSA").

We, therefore, conclude that Fannin's security interest continued in the identifiable proceeds of the wheat sale to Wolfe City, i.e., the sale price of $272,855.57. Fannin claims that, due to the continuation of its security interest in those proceeds, it had a superior right to possession of the proceeds versus American. *See Conoco, Inc. v. Amarillo Nat'l Bank*, 950 S.W.2d 790, 796 (Tex. App.—Amarillo 1997) ("If a transfer of collateral encumbered by a security interest takes place without the secured party's consent, the transferee takes the collateral subject to the security interest and the second party may bring an action for

---

[41]"[S]ecurity interest" is specifically defined as "an *interest in farm products* that secures payment or performance of an obligation." 7 U.S.C.A. § 1631(c)(7) (West, Westlaw current through PL 117-45) (emphasis added).

conversion"), *vacated on other grounds*, 14 S.W.3d 325 (Tex. 2000); *Scitern v. Birdsong Corp.*, No. 11-99-00236-CV, 2000 WL 34235176, at *1 (Tex. App.—Eastland May 11, 2000, no pet.) (not designated for publication); *see also Hernandez v. Sovereign Cherokee Nation Tejas*, 343 S.W.3d 162, 175 (Tex. App.—Dallas 2011, pet. denied) ("An action will lie for conversion of money when its identification is possible and there is an obligation to deliver the specific money in question or otherwise particularly treat specific money." (quoting *Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.))). To this point, at least, it seems that Fannin had a superior claim to the proceeds versus American.

### 2. Section 9.332 Does Not Insulate American from Fannin's Claim to Identifiable Proceeds

Section 9.332 of the Texas Business and Commerce Code provides:

> (a) *A transferee of money* takes the money free of a security interest unless the transferee acts in collusion with the debtor in violating the rights of the secured party.

> (b) A transferee of funds from a deposit account takes the funds *free of a security interest in the deposit account* unless the transferee acts in collusion with the debtor in violating the rights of the secured party.

TEX. BUS. & COM. CODE ANN. § 9.331(a), (b) (emphasis added). The parties dispute whether Section 9.332 insulates American from Fannin's claim to identifiable proceeds of H. Farms's wheat crop sale to Wolfe City.

### a. American Was Not a Transferee of Money Under Section 9.332(a)

Subsection (a), by its terms, applies only to a transferee of money. Fannin contends that, because the transfer at issue was not a transfer of money, and instead was a transfer of a check,

57

subsection (a) does not apply to this transaction. "Money" is defined in Section 1.201(24) of the Business and Commerce Code as "a medium of exchange currently authorized or adopted by a domestic or foreign government." TEX. BUS. & COM. CODE ANN. § 1.201(b)(24) (Supp).[42] A "[c]heck" is defined as "(i) a draft, other than a documentary draft, payable on demand and drawn on a bank or (ii) a cashier's check or teller's check." TEX. BUS. & COM. CODE ANN. § 3.104(f); *see Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) ( defining "check" as "an order to the drawee bank to pay the sum stated, signed by the maker and payable on demand"); *Check*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "check" as "[a] draft, other than a document draft, signed by the drawer, payable on demand, drawn on a bank, and unconditionally negotiable"). Under those definitions, American was a transferee of a check, but was not a transferee of money. Accordingly, Section 9.332(a), by its explicit terms, does not apply to shield American from Fannin's claim to identifiable proceeds.

Yet, American contends that it was a transferee of money under Section 9.332(a) because a check is, in fact, money. It relies on the official comment to Section 1.201(24), which states that "the narrow view that money is limited to legal tender is rejected." TEX. BUS. & COM. CODE ANN. § 1.201 cmt. 24. Indeed, "legal tender" is defined as "[t]he money (bills and coins) approved in a country for the payment of debts, the purchase of goods, and other exchanges for value." *Legal tender*, BLACK'S LAW DICTIONARY (11th ed. 2019). Even though the comment

---

[42]Section 1.201(a) states, "Unless the context otherwise requires, words or phrases defined in this section, or in the additional definitions contained in other chapters of this title that apply to particular chapters or parts thereof, have the meanings stated." TEX. BUS. & COM. CODE ANN. § 1.201(a) (Supp).

clarifies that "money" is not limited to legal tender, it does not necessarily follow that "money" includes a check.

First, the official comment to Section 3.107 (Instrument Payable in Foreign Money) states, "The definition of instrument in Section 3-104 requires that the promise or order be payable in 'money.' That term is defined in Section 1-201(24) and is not limited to United States dollars." TEX. BUS. & COM. CODE ANN. § 3.107 cmt. So, although "money" is not restricted to "legal tender," this comment tells us that the term "money" is not limited to United States dollars and, thus, would include money approved in any other country for the payment of debts, for purchases, and for other exchanges for value. This conclusion is supported by the remainder of the official comment to Section 1.201(24): "The test [of whether something is money] is that of sanction of government, whether by authorization before issue or adoption afterward, which recognizes the circulating medium as part of that official currency of that government." TEX. BUS. & COM. CODE ANN. § 1.201 cmt. 24.

Second, a check is a negotiable instrument. *See* TEX. BUS. & COM. CODE ANN. § 3.104(f). A "negotiable instrument" is "an unconditional promise or order to pay a fixed amount of money . . . if it . . . is payable to bearer or to order at the time it is issued or first comes into possession of a holder[,] . . . is payable on demand or at a definite time[,] . . . and . . . does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money." TEX. BUS. & COM. CODE ANN. § 3.104(a). This definition is categorically different than the definition of money. American argues that, as a practical matter, when the check is presented, the obligation arising out of the check is

59

discharged and the payee is then a transferee of money. In support of this position, American relies on *In re Vienna Park Properties*, 976 F.2d 106, 116 (2nd Cir. 1992), in which the court stated, "There is no question that the funds held in the escrow account, United States dollars, are 'money' within this definition [of Section 1.201(24)]." We do not find this argument compelling. Although funds in a deposit account may fit within the definition of "money," a check is not, by itself, money.

We conclude that a check is not the same as money for purposes of Section 9.332(a). Because American was not a transferee of money under Section 9.332(a), this section does not insulate American from Fannin's claim to identifiable proceeds.[43]

> **b.** **Section 9.332(b) Does Not Insulate American from Fannin's Claim to Identifiable Proceeds Drawn from H. Farms's Deposit Account**

Section 9.332(b) presupposes that a security interest in the deposit account exists. Fannin never claimed that it maintained a security interest in H. Farms's deposit account at American. It merely maintained that it had a security interest in the proceeds of H. Farms's wheat crop, which were deposited into the American account.

"A security interest . . . in [a] deposit account[] may be perfected by control of the collateral under Section 7.106, 9.104, 9.105, 9.106, or 9.1071." TEX. BUS. & COM. CODE ANN. § 9.314(a). "A security interest in [a] deposit account[] is perfected by control under Section 7.106, 9.104, 9.105, or 9.1071 when the secured party obtains control and remains perfected by

---

[43]The official comment to Section 9.315 provides, "Section 9-332 enables most transferees (including non-purchasers) of funds from a deposit account and most transferees of money to take free of a perfected security interest in the deposit account or money." TEX. BUS. & COM. CODE ANN. § 9.315 cmt. 2. The comments do not describe Section 9.332 as operating to cut off a security interest in proceeds.

control only while the secured party retains control." TEX. BUS. & COM. CODE ANN. § 9.314(b).

Section 9.104, as applicable to a deposit account, provides that a "secured party has control of a

deposit account" in three circumstances:

> (1)    the secured party is the bank with which the deposit account is maintained;
>
> (2)    the debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the . . . account . . . ; or
>
> (3)    the secured party becomes the bank's customer with respect to the deposit account.

TEX. BUS. & COM. CODE ANN. § 9.104(a).   Clearly, Fannin was not the bank in which the

account was maintained.  Further, there is no evidence that H. Farms, Fannin, and American had

any sort of agreement such as is described under subpart (2).  Finally, there is no evidence that

Fannin became American's customer with respect to H. Farms's account.  As a result, Fannin did

not have a perfected security interest in H. Farms's account at American; this provision,

therefore, does not apply unless the phrase "security interest in [the] deposit account[]" has a

broader meaning than stated.

Our sister court was faced with a similar issue in *Madisonville State Bank v. Canterbury,*

*Stuber, Elder, Gooch & Surratt, PC*, 209 S.W.3d 254 (Tex. App.—Dallas 2006, no pet.).  In that

case, Madisonville State Bank advanced debtor an $8 million line of credit secured by debtor's

accounts receivable, inventory, chattel, documents, and equipment.  The Canterbury law firm

represented debtor during the relevant time and billed for its service.  Debtor paid Canterbury

three checks totaling almost sixty thousand dollars from an account at a different bank.  As a

result, Madisonville advised Canterbury that it did not authorize debtor to pay Canterbury and

61

demanded return of the funds. Canterbury sued, seeking a declaratory judgment that it was under no duty or obligation to return any fees paid by debtor. The trial court granted summary judgment in favor of Canterbury. *Id.* at 256.

On appeal, Canterbury claimed that it took the funds paid by debtor free and clear of any security interest of Madisonville, pursuant to Section 9.332(b) of the Texas Business and Commerce Code. Madisonville countered, claiming that it did not have a security interest in the deposit account at debtor's bank. It instead claimed that it had a security interest in certain of debtor's assets, the proceeds of which were deposited into debtor's bank account. *Id.* at 258. After recognizing the limited circumstances in which a secured party has control of a deposit account pursuant to Section 9.104(a), the court observed that the summary judgment record did not contain evidence showing that Madisonville "had control, i.e., a perfected security interest, in [debtor's] deposit account at" debtor's bank. *Id.* As a result, Canterbury "failed to establish as a matter of law that section 9.332 governed this situation," resulting in a reversal of the summary judgment. *Id.* at 259.

The Fifth Circuit Court of Appeals analyzed Section 9.332(b) in *In re Tusa-Expo Holdings, Inc.*, 811 F.3d 786 (5th Cir. 2016). In *Tusa*, Tusa sold and delivered furniture manufactured by Knoll on credit, with Knoll taking a first-priority security interest in all of Tusa's assets, including its accounts receivable. *Id.* at 789. Separately, Tusa obtained a revolving loan from Textron and granted it a first-priority security interest in all of Tusa's assets, including Knoll's collateral. *Id.* at 790. Tusa's loan agreement with Textron required Tusa to have its customers make account receivable payments into a lockbox account controlled by

Textron. *Id.* Textron then withdrew the deposited funds daily and applied them to increase the available credit to Tusa on its revolving loan. On request, Textron would advance new revolving loan funds to Tusa's operating account. Tusa used funds from its operating account to pay Knoll. *Id.*

In the *Tusa* bankruptcy proceeding, the court was faced with the issue of whether the accounts receivable and proceeds remained Knoll's collateral after being transferred first into the lockbox by Tusa's customers, then out of the lockbox by Textron, and then to Tusa's operating account. *Id.*

The trustee acknowledged that payments into the lockbox were proceeds of Tusa's accounts receivable, she nevertheless claimed that Section 9.322(b) stripped Knoll's first-priority security interest in the proceeds of Tusa's accounts receivable when the lockbox funds were transferred to Textron. *Id.* Knoll disagreed, claiming that Section 9.332(b) only concerned a security interest in the deposit account itself, rather than a security interest in the funds contained in the account. The court explained:

> The plain language of § 9.332(b) states that a "transferee of funds from a deposit account takes the funds free of a security interest *in the deposit account*." Although § 9.332(a)—which applies to transfers of "money"—and § 9.332(b)— which applies to transfers of "funds"—are similar, they are not identical. Specifically, § 9.332(a) provides that "[a] transferee of money takes the money free of *a* [*read: any*] *security* interest." By contrast, § 9.332(b) provides that "[a] transferee of funds from a deposit account takes the funds free of *a security interest in the deposit account* . . . ." This difference must have been intentional. The drafters could have specified, but did not, that "a transferee of funds from a deposit account takes the funds free of a [*read:* any] security interest" as they did in § 9.332(a). Or they could have specified that "a transferee of funds from a deposit account takes the funds free of a security interest *in the funds themselves*." The comments to § 9.332 bolster this distinction between a deposit account itself and the funds contained in it. In particular, the comments explain that § 9.332(b)

"applies to *transfers of funds from* [a] deposit account" but "does not apply to *transfers of the deposit account* itself or of [a security] interest therein."

> The comments to § 9.332 further explain that "[b]road protection for transferees helps to ensure that security interests in deposit accounts do not impair the free flow of funds."

*Id.* at 795–96 (alterations in original) (citations omitted). As a result of this analysis,[44] the court held

> that § 9.332(b) ensures that the *funds* in a deposit account remain unencumbered by a security interest in the deposit account itself. Section 9.332(b) does not even address, must less strip, a security interest that encumbers the funds contained in the deposit account. Stated simply, § 9.332(b) protects Knoll from Textron's first-priority security interest in the deposit account; it does not, however, protect Textron from Knoll's first-priority security interest in the funds contained in that account.

*Id.* at 796. *Tusa* and *Canterbury* support Fannin's contention that Section 9.332(b) does not strip its security interest in the proceeds of its collateral placed in H. Farms's checking account at American.

American points to differing interpretations of Section 9.332(b),[45] relying on an Idaho case interpreting the same version of this section. *See Keybank Nat'l Ass'n v. Ruiz Food Prods.,*

---

[44]This analysis has been criticized as a confusion of the concepts of contract and property:

> [The *Tusa-Expo* court's] discussion reveals a profound misunderstanding of a deposit account. A deposit account as collateral is really the intangible deposit entitlement, and the funds 'in' the deposit account do not actually exist as a property item. The funds are just a book-entry indication of the balance that the bank is obligated to pay upon the direction of the customer. When the debtor as the customer directs disposition to a transferee of an amount of funds credited to the deposit account, its property interest—the deposit entitlement to that amount—ends to that extent (even though the deposit account itself continues to exist until it is closed). The customer no longer has the right to direct disposition of that amount of funds. Under Section 9-315(a)(2), however, a security interest in collateral—nominally, the deposit account, but in legal reality the deposit entitlement—continues in identifiable proceeds. The purpose of Section 9-322(b) is to create an exception to this normal rule.

Thomas E. Plank, *Security Interests in Deposit Accounts, Securities Accounts, & Commodity Accounts: Correcting Article 9's Confusion of Contract and Property*, 69 OKLA. L. REV. § 339 (2017).

*Inc.*, No. CV 04-296-MHW, 2005 WL 2218441 (D. Idaho, Sept. 9, 2005) (mem. op.). Keybank

had a first-priority security interest in the accounts receivable of PDI. *Id.* at *3. PDI then began

depositing proceeds from its accounts receivable and inventory sales into a different account at a

credit union. In response to Keybank's conversion claim, the credit union filed a motion for

summary judgment. The trial court granted the motion, concluding that the credit union was a

transferee of funds protected by Section 9.332(b). The appellate court affirmed, finding that an

innocent transferee takes funds transferred from a deposit account free of a security interest in

the collateral of which the funds were proceeds. *Id.* at *6–7.

American urges this Court to rely on *Keybank*'s analysis, pointing out that its reasoning

was adopted in *City Bank v. Compass Bank*, 717 F. Supp.2d 599 (W.D. Tex. 2010) (concluding

security interest was lost when creditor swept account). In that case, City Bank argued that

*Canterbury* precluded the application of Section 9.332, because

> that case squarely addresses the circumstance in which there is a lien against a set
> of accounts receivable, the proceeds of a receivable are deposited into a bank
> account, a payment is made from that bank account, and the secured lender seeks
> to enforce its lien against the funds while they are in the hands of the payee.

*Id.* at 616. *City Bank*, however, expressly rejected the reasoning in *Canterbury* as unsound. The

court stated that Comment 3 to Section 9.332 "specifically defines encumbered accounts as being

not only those subject to a direct security interest filed over the account itself, but also 'deposit

accounts containing collections from accounts receivable.'" *Id.* at 616–17 (citing TEX. BUS. &

---

[45]American also points to what appear to be internal inconsistencies in the policy underlying Section 9.332 and the example of an "encumbered deposit account[]" as one "containing collections from accounts receivable." TEX. BUS. & COM. CODE ANN. § 9.332 cmt. 3. Yet, the policy expressed in that same comment is one of providing "[b]road protection for transferees [to] help[] to ensure that security interests in deposit accounts do not impair the free flow of funds . . . and [to] minimize[] the likelihood that a secured party will enjoy a claim to whatever the transferee purchases with the funds." *Id.*

COM. CODE ANN. § 9.332 cmt. 3). Instead, *City Bank* followed the lead of *Keybank* in determining that Section 9.332(b) includes accounts containing encumbered receivables proceeds. *Id.* at 617 (concluding that the "origin of the security interest over the funds in the account is immaterial—accounts with liens filed on them directly and unencumbered accounts which receive encumbered proceeds are both covered by § 9.332") (citing TEX. BUS. & COM. CODE ANN. § 9.332 cmt. 3).

In *Tusa*, the Fifth Circuit explicitly disapproved of *City Bank*, stating that the court "disregarded the plain language of § 9.332 in favor of the comments." *Tusa*, 811 F.3d at 796. Instead, the *Tusa* court believed that, "[i]n context, the comments merely explain that § 9.332 is justified because 'payments of funds from encumbered deposit accounts (e.g., deposit accounts containing collections from accounts receivable) occur with great regularity.'" *Id.* at 797. The court further stated that *City Bank*'s assertion that "deposit accounts containing collections from accounts receivable," are taken "free of a security interest in the deposit account," although likely dicta, is incorrect. *Id.*

We find the reasoning and analysis in *Tusa* and *Canterbury* persuasive. The application of the analysis in those cases leads us to conclude that Section 9.332(b) does not apply to the facts before us because the summary judgment record does not contain evidence showing that Fannin had a perfected first-priority security interest in H. Farms's deposit account at American pursuant to Section 9.104(a). *See* TEX. BUS. & COM. CODE ANN. § 9.104(a). As a result, we conclude that Section 9.332(b) did not insulate American from Fannin's claim to identifiable proceeds drawn from H. Farms's deposit account.

### c. Section 9.341 Does Not Shield American from Fannin's Conversion Claim

American relies on Section 9.341 of the Business and Commerce Code in support of its claim that it acted lawfully in exercising dominion and control over the funds at issue. It claims that it was required to follow its customer's instructions—both in depositing the Wolfe City check into H. Farms's account and in applying the resulting funds in payment of its loans. Section 9.341 provides,

> [U]nless the bank otherwise agrees in an authenticated record, a bank's rights and duties with respect to a deposit account maintained with the bank are not terminated, suspended, or modified by:
>
> (1) the creation, attachment, or perfection of a security interest in the deposit account;
>
> (2) the bank's knowledge of the security interest; or
>
> (3) the bank's receipt of instructions from the secured party.

TEX. BUS. & COM. CODE ANN. § 9.341.

Based on the preceding analysis in which we concluded that Fannin did not have a security interest in H. Farms's deposit account at American, Section 9.341 does not apply to the facts before us. Section 9.607, on which American further relies for the proposition that Fannin was required to use an available judicial procedure to secure the funds, TEX. BUS. & COM. CODE ANN. § 9.607 cmt. 7 (addressing instances in which deposit account is secured party's collateral), likewise does not apply for the reasons discussed above.

American further claims, though, that Fannin failed to notify it of its first-priority security interest in the proceeds and failed to revoke its consent to the sale of the wheat crop.[46] This argument is based on the premise that, because no payment on Note One was due by H. Farms at the time of the wheat crop sale, Fannin consented to H. Farms's continued possession of the collateral. American relies on *City Bank* for the proposition that, when the collateral is placed in the hands of a third party, a claim for conversion arises only if that consent is validly revoked in a communication directed at that third party.[47] *See City Bank*, 717 F. Supp.2d at 612. As previously stated, the reasoning of *City Bank* was rejected in *Tusa*.

Further, there is no evidence in the record that Fannin consented in writing to the sale of the crop and to the disposition of the proceeds. Such written consent was required because the security agreement between Fannin and H. Farms stated that H. Farms would "not sell, offer to sell, lease, or otherwise transfer or encumber the Property without [Fannin's] prior written permission, except for Inventory sold in the ordinary course of business at fair market value, or at a minimum price established between [H. Farms] and [Fannin]." Because it is defined as "goods other than farm products," the exception for inventory does not apply by the express terms of the agreement. As a result, the security agreement required Fannin's written consent to sell crops. Because "a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors," TEX. BUS. & COM. CODE ANN.

---

[46]To the extent that this argument pertains to FSA notice, that issue has already been addressed in a preceding section of this opinion.

[47]We express no opinion on whether *City Bank*, in fact, stands for this proposition. In that case, City Bank consented to the debtor's use and disposal of receivables in the ordinary course of business. *See City Bank*, 717 F. Supp.2d at 612.

§ 9.201(a), American was required to show that Fannin consented in writing to the wheat crop sale. No such evidence was presented. *See* TEX. BUS. & COM. CODE ANN. § 9.201(a) cmt. 2 ("security agreement is effective between the debtor and secured party and is likewise effective against third parties"); *see Legacy Bank v. Fab Tech Drilling Equip., Inc.*, 566 S.W.3d 922, 931 (Tex. App.—Eastland 2018, pet. denied) (same).

As a result—and aside from the estoppel issue—the evidence supports the conclusion that Fannin proved its conversion claim. First, the evidence established that Fannin had a prior perfected security interest in the collateral securing its loan, i.e., the wheat, and likewise had a perfected security interest in the proceeds of its collateral, i.e., the funds paid to American by H. Farms on the sale of the wheat. Fannin, therefore, had a superior right to the proceeds of the collateral versus American. The evidence further established that American wrongfully assumed exercise of dominion and control over the proceeds, as it took the proceeds subject to Fannin's first-priority security interest, to the exclusion of Fannin. American's receipt of the funds and application of same to H. Farms's seed and fertilizer loans evidence a clear repudiation of Fannin's rights, thus obviating the need for evidence of a demand for return of the funds and a refusal to return same. *See Stephens*, 2020 WL 7330270, at *10.

Fannin, therefore, established its conversion claim as a matter of law. American contends that it was nevertheless entitled to summary judgment because the summary judgment evidence established that Fannin was estopped from asserting its conversion claim. We next examine the elements of estoppel to determine whether American conclusively established those elements.

**C. American Did Not Conclusively Establish that Fannin Was Estopped from Asserting its Conversion Claim**

"A defendant moving for summary judgment based on an affirmative defense has the burden to conclusively prove all elements of the affirmative defense." *In re V.M.T.*, No. 04-17-00575-CV, 2018 WL 3861724, at *5 (Tex. App.—San Antonio Aug. 15, 2018, pet. denied) (mem. op.) (citing *Montgomery v. Kennedy*, 669 S.W.2d 309, 310–11 (Tex. 1984)).

> The elements of equitable estoppel are (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations.

*Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 486 (Tex. 2017).

To support its equitable estoppel defense, American relies on summary judgment evidence that it characterizes as indicative of Fannin's agreement to pay off American's seed and fertilizer loans to H. Farms. The evidence showed that, in late 2013, Hartwell was in the process of obtaining an FSA-guaranteed line of credit from Fannin for seed and fertilizer purchases. Because it was taking "months" to secure the line of credit, Hartwell testified that he went to American to secure a seed and fertilizer loan. Hartwell testified that Fannin advised him to go to American for a loan until the FSA-guaranteed loan was completed. According to Hartwell, Amlin and Allen Sanderson talked about it and "[e]verybody was fine with it." Hartwell understood that the "agreement" was "when [he] sold the wheat to pay American off with the money first." When Hartwell sold the wheat, he paid off the American seed and fertilizer loans and turned in his monthly operating report—reflecting what was sold and what was spent each

70

month—to Fannin. Nothing was ever said. According to Hartwell, H. Farms's payment to American was on the monthly operating report.[48]

The summary judgment evidence reflects that Sanderson (Fannin Bank CFO) and Amlin (American's branch manager) testified by affidavit that, because Fannin had a first lien on all equipment owned by H. Farms, Amlin would often communicate with Sanderson regarding the release of specific items of equipment to serve as collateral for American loans. According to Amlin, he and Sanderson had a good working relationship on behalf of Fannin and American, respectively. Amlin testified, "On several occasions, [American] provided interim financing to Hartwell Farms, LLC and received funds from Fannin . . . to pay off various Hartwell Farms, LLC loans." In the Fall of 2013, Amlin became aware that H. Farms was in the process of securing an FSA-guaranteed loan through Fannin. Hartwell approached Amlin regarding interim seed and fertilizer financing pending approval and funding of the FSA-guaranteed loan.

On February 18, 2014, Amlin emailed Sanderson advising that American could help "Scott with interim money." Amlin's complete email to Sanderson stated:

> I think I can help Scott with interim money, but before I do. Can you tell me that if . . .
>
> The financial statement is satisfactory with FSA and if FSA is still guaranteeing a percentage of the operating note, Will Scott be approved for the note,
>
> If so, can yall payoff the $100,000 interim loan we make with the operating funds,

---

[48]While income from the wheat crop sale is shown on the cash flow statement, it does not reflect a payment to American. It does show the following expense: "Fert (2015) $237,395.95." That was the amount of the check paid to American.

71

Let me know

Thanks

> Garrett Amlin
> Vice President
> American Bank of Texas

Sanderson replied via email dated February 19, 2014:

> If the FSA approves, we will be able to renew the note with the increase. We can only fund for farm expenses and Scott will have to furnish the docs. The request is still waiting approval.
>
> Allen R. Sanderson
> Vice Chairman/President
> Loan Orig. ID 523064
> Fannin Bank

By affidavit, Amlin testified, "I . . . understood from his response and our prior course of dealing that once the FSA guaranteed loan was funded, our seed and fertilizer loan could be paid off from the Fannin Bank funds." Amlin further testified, "At no time did I have any communication with Scott Hartwell regarding any interest that Fannin . . . might have in these funds nor did we receive any communication from Fannin . . . inquiring or claiming these funds until we were served with a lawsuit on or about July 7, 2015."

Sanderson testified, relative to the emails, that Amlin was asking, "[I]f we got the necessary information for the FSA loan to be guaranteed and approved; and, if it's approved, can you pay the $100,000 interim loan." Sanderson explained that they "[could] only fund for farm expenses," which included seed and fertilizer. Sanderson further explained that, if Hartwell had brought the crop proceeds to Fannin and asked if he could use those proceeds to pay off American, he would have told Hartwell that the money first needed to come to Fannin. In other

words, Hartwell could have paid down the revolving loan and then asked for an advance to pay American. Such a request would have been authorized. It was not his intent to represent to Amlin that Fannin would pay off any seed and fertilizer loan.

American contends that Fannin is estopped to assert its conversion claim because the foregoing evidence shows (1) that Fannin participated in, and even suggested, an arrangement whereby American would provide interim financing to H. Farms while it awaited FSA insured funding, (2) Fannin represented that it would have no problem advancing funds for H. Farms to pay off American's loans, (3) Fannin remained silent when and failed to notify American that it had a claim against crop sale proceeds, and (4) American relied on those statements, actions, and failure to act in extending the loans to H. Farms.

Rather than establishing estoppel as a matter of law, the summary judgment evidence is rife with fact issues. The Sanderson/Amlin emails are ambiguous; Sanderson's email stated, "Scott will have to furnish the docs." This could mean that Hartwell would be required to fill out the appropriate paperwork to seek an advance on the line of credit to pay off American.[49] Sanderson testified that it was not his intent to represent to Amlin that Fannin would pay off the seed and fertilizer loans. Additionally, there is a dearth of evidence in the record that American was without knowledge, or had no means of acquiring knowledge, of Fannin's secured position and its alleged agreement to waive that secured position to subsidize the payment of H. Farms's two seed and fertilizer loans to American.

---

[49]American's briefing seems to imply that the doctrine of estoppel by silence should apply by arguing that Fannin remained silent when it should have spoken up. Although the law is not analyzed on this issue, this doctrine would not apply in any event. While there is some evidence that Hartwell submitted cash flow statements to Fannin, nothing about that evidence suggests that Fannin was aware that H. Farms paid the crop proceeds to American.

The question of whether Fannin is estopped to assert its conversion claim must be determined by the trier of fact.[50]

## VI. Conclusion

We affirm the trial court's summary judgment on Fannin's breach of contract claims against H. Farms and Hartwell. We reverse the trial court's judgment on Fannin's alter ego and sham claims and remand those claims to the trial court for resolution by the fact-finder. Because the trial court's imposition of joint and several liability necessarily flows from Fannin's alter ego and sham claims, that portion of the judgment imposing joint and several liability against the Hartwell Parties is likewise reversed. We reverse the attorney fee award in favor of Fannin and remand the attorney fee claim to the trial court for resolution by the fact-finder. We affirm the trial court's summary judgment in favor of Fannin on the Hartwell Parties' counterclaims.

We reverse the summary judgment in favor of American against Fannin.

We remand to the trial court for further proceedings consistent with this opinion.


Ralph K. Burgess
Justice


Date Submitted:     August 25, 2021
Date Decided:       November 12, 2021

---

[50]Fannin asks this Court to render judgment on its declaratory judgment action. The summary judgment evidence that established Fannin's conversion claim likewise supports its entitlement to declaratory judgment. Like the conversion claim, the successful assertion of a remedy flowing from this claim hinges on the fact-finder's resolution of American's estoppel defense.